[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1147 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1148 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1149 
¶ 1. The Berrys sought to have their neighbors' fences removed as being violative of the "visual barriers" provision of the restrictive covenants for the Buckingham subdivision in Brandon, Mississippi. The neighbors, the Burns and the Journeays, argue that the covenants were invalid to begin with, and even if valid, that variances were obtained and the restrictive covenants amended to allow the fences. The Berrys counter that the Burns and the Journeays had actual and constructive notice of the restrictions and that any attempt to obtain a variance or amend the covenants was improper.
 ¶ 2. The lower court granted a cross summary judgment motion in favor of the Berrys, stating that (1) although the covenants were improperly filed with the recording office, (2) the Burns and the Journeays had actual and constructive knowledge of the restrictions, (3) the Burns and the Journeays acknowledged the covenants by seeking to obtain variances and other approvals, and (4) the Burns's and the Journeay's immediate predecessors-in-title expressly agreed to be bound by the covenants. Therefore, the court found that the Burns and the Journeays were bound by the restrictive covenants. Aggrieved, the Burns and the Journeays appeal, arguing the following:
 I. WHETHER THE COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF BERRY.
 II. WHETHER THE CHANCELLOR'S DENIAL OF THE RULE 56(F) REQUEST FOR ADDITIONAL TIME DENIED BURNS AND JOURNEAY A FAIR OPPORTUNITY TO RESPOND TO BERRY'S CROSS SUMMARY JUDGMENT MOTION.
 III. WHETHER THE CHANCELLOR'S DENIAL OF THE RULE 59 MOTION WAS ERRONEOUS.
 IV. WHETHER THE SUPERSEDEAS BOND REQUIRED BY THE CHANCERY COURT WAS PROPER AND WHETHER ITS AMOUNT SHOULD HAVE BEEN REDUCED. *Page 1150 
 ¶ 3. The Berrys also cross-appeal, claiming that as the "prevailing party," they should have been awarded attorneys' fees and costs, which the covenants unconditionally provide to the prevailing party in litigation.
 ¶ 4. We affirm the decision of the chancery court, except that we reverse and remand on cross-appeal for a determination of attorneys' fees.
 FACTS ¶ 5. Charles and Michelle Berry (hereinafter referred to collectively as "Berry") brought suit against their next door neighbors Henry R. and Janie E. Journeay (hereinafter referred to collectively as "Journeay"), and J. Baxter and Wanda Burns (hereinafter referred to collectively as "Burns"), asserting that the Journeay's and Burns's fences violated the restrictive covenants governing their neighborhood property, and that the fences caused damage to Berry. The subdivision in question is the Buckingham subdivision located in Brandon, Mississippi.
 ¶ 6. Burns and Journeay own Lots 59 and 61 respectively of the Buckingham subdivision. Berry owns Lot 60. The fences in question, which run along the front of Lot 59 and two that run to the waterfront of Lots 59 and 61, are made of wrought iron and brick. A lake runs directly north of all three lots that is available for the use and enjoyment of all residents of the subdivision.
 ¶ 7. Berry contends that both Burns's and Journeay's lots are encumbered by a restrictive convent entitled, "Protective Covenants Buckingham Subdivision," which were recorded in the land records of Rankin County on August 4, 1998. When the covenants were recorded, Michael Greene and Walter "Boo" Baker held title to the subdivision property in their individual names. However, the named declarant of and signatory to the covenants was "L.O.M. Corporation," which apparently did not exist at the time the covenants were executed. A series of purported transfers and curative efforts followed. Below is a time line to assist with the events and parties involved.
 ¶ 8. January 1997: Michael Greene and Walter L. "Boo" Baker purchased land in Rankin County for a subdivision development. They also formed L.O.M. Properties, Inc. for the purpose of developing the new subdivision entitled, "Buckingham."
August 4, 1998: Greene and Baker filed the plat for the subdivision and the protective covenants with the Office of the Chancery Clerk of Rankin County, Mississippi at Book 843, Page 575. The covenants were properly indexed, but Greene mistakenly listed the declarant's name as "L.O.M. Corporation." The correct name was "L.O.M. Properties, Inc." Greene also signed the covenants as President of "L.O.M. Corporation." The only legal entity registered with the Mississippi Secretary of State at that time having "L.O.M." in its title was L.O.M. Properties, Inc.
August 14, 1998: Greene and Baker conveyed their interests in the realty to "L.O.M. Corporation." The deed was recorded at Book 847, Page 380 with the Office of the Chancery Clerk of Rankin County. The conveyance was made "subject to all applicable building restrictions, restrictive covenants, easements and mineral reservations of record."
September 3, 1998: Greene signed a warranty deed as President of "L.O.M. Corporation," conveying Lot 61 to Finley and Robin Stricklin as joint tenants with rights of survivorship. The deed was recorded at Book 847, Page 380, and states that the property was subject to all applicable restrictive covenants. The Stricklins also received a copy of the covenants at their *Page 1151 
closing and expressly agreed to abide by them. The Stricklins are the predecessors-in-title to Journeay.
October 5, 1998: Greene and Baker, realizing the incorrect corporate name was listed on the deed conveyances, issued a quitclaim deed, conveying interest in the subdivision from "L.O.M. Corporation" to the correct name, "L.O.M. Properties, Inc." The quitclaim deed is recorded at Book 850, Page 843, and the conveyance is subject to "applicable building restrictions, [and] restrictive covenants." In addition, Greene issued a corrected warranty deed to the Stricklins on Lot 61 as joint tenants with rights of survivorship. The corrected warranty deed is recorded at Book 850, Page 486, and like the original warranty deed, states that the conveyance is subject to the restrictive covenants.
February 15, 1999: L.O.M. Properties conveyed Lots 59 and 60 to Steve L. And Teresa H. Milner. The warranty deed is recorded at Book 863, Page 488, and states that the conveyance is subject to the restrictive covenants. The Milners also received a copy of the covenants at their closing and agreed to abide by them "as long as we own a lot in the Buckingham subdivision." Later, the Milners built a fence on the front of their property which violated the front setback line provision in the covenants.
July 25, 2000: The Stricklins conveyed Lot 61 by warranty deed to Journeay. The warranty deed was recorded at Book 917, Page 617 and stated that the conveyance was subject to the restrictive covenants.
March 15, 2001: The Buckingham Property Owners Association was formed as a non-profit. All Buckingham lot owners are members of the Association. The Association elected a Board of Directors (hereinafter the "Board"), and also formed an Architectural Review Committee (hereinafter the "ARC") to review proposed building plans for subdivision lots.
May 11, 2001: Billy Wayne and Cynthia Herron conveyed by warranty deed Lot 60 to the Berrys. The warranty deed is recorded at Book 946, Page 303, and was subject to all restrictive covenants.
May 16, 2002: At a Board meeting, the ARC reviewed Journeay's request for approval to build a fence on Lot 61 to enclose a pool. The Board denied the request because the proposed fence was in violation of the covenants and informed Journeay of the denial. The Board further found that it had no authority to grant variances or exceptions to proposed building plans that would violate the covenants.
July 2002: Ignoring the decision of the Board, Journeay built a wrought iron fence with brick columns down the side of his house into the lake.
October 4, 2002: The Board notified Journeay by letter that the fence violated Article 11 of the covenants.
October 7, 2002: The Board notified the Milners that their fence built on Lot 59 violated Article 11 of the covenants. The fence was constructed of brick and wrought iron and ran along and adjacent to the street right-of-way next to Berry's property.
January 14, 2003: Members of the home-owners association proposed certain amendments to the covenants; two of these directly affected Article 11 and would have allowed the fence that was built by Journeay to stay. However, the amendment failed. An amendment detailing the procedure for approving variances also failed.
February 25, 2003: Berry filed suit to compel Journeay to remove the portion of their fence coming within twenty-five feet of the water's edge. *Page 1152 
July 29, 2003: The ARC reviewed the Burns's plans for a pool and cabana on Lot 59, the lot which they were planning to purchase from the Milners. The ARC approved the plans but did not discuss whether a fence was included in the plans.
August 19, 2003: The Milners conveyed Lot 59 to Burns. The warranty deed is recorded at Book 1029, Page 50, and is subject to all restrictive covenants. An addendum to Burns's contract for the purchase of real estate signed on June 16, 2003, expressly indicates, "Purchaser acknowledges receipt of the Protective Covenants for Buckingham Estates and agrees to comply."
Fall 2003: Burns built an additional wrought iron fence forming a boundary around all of Lot 59 located on dry land. Part of the fence built lies within twenty-five feet of the edge of the lake and actually goes into the lake. Part of the fence also is constructed nearer to the street than the rear wall of the residence on Lot 59. At some point, Berry verbally warned Burns of the pending litigation between himself and Journeay for a similar fence. Burns continued with the construction of the fence anyway.
October 25, 2003: The Board notified Burns by letter that their fence violated Article 11 of the covenants.
August 10, 2004: Berry added Burns as defendants in their lawsuit against Journeay. Burns filed a motion for summary judgment, seeking an adjudication that the covenants in question were, as a matter of law, defective and invalid. Burns claimed that the restrictive covenants were filed under a non-existent corporate moniker. The named declarant of and signatory to the covenants on record is "L.O.M. Corporation." At the time the covenants were recorded, Michael Greene and Walter "Boo" Baker owned the subdivision property as "L.O.M. Properties, Inc."
August 16, 2004: Journeay joined in Burns's motion for summary judgment.
August 17, 2004: Berry filed a cross-motion for summary judgment. In their response to Berry's cross motion for summary judgment, Burns and Journeay argued that they had not had an opportunity to depose Berry. Therefore, summary judgment should be denied. However, neither Burns nor Journeay filed for or took any discovery.
September 2004: Burns and Journeay approached subdivision lot owners with "Declarations of Consent," which attempted to add another paragraph to Article 17 of the covenants. The language implemented a procedure for approving single-lot variances, and specifically gave approval for Burns's and Journeay's fences.
January 26, 2005: After hearing oral arguments, the chancellor granted Berry's summary judgment motion but declined to award them costs and attorneys' fees.
March 9, 2005: A final judgment was entered, which included an injunction to be enforced against Burns and Journeay by a prospective contempt sanction. The chancery court held that the covenants were valid and enforceable against the Burns and Journeays because: (1) Burns and Journeay had actual and constructive knowledge of the covenants when they acquired title to Lots 59 and 61, and (2) they acknowledged the validity of the covenants by repeated attempts to obtain variances and architectural approval of their fences and other structures, and (3) their immediate predecessors-in-title expressly agreed in writing to be bound by the covenants.
 ¶ 9. Burns and Journeay subsequently moved to alter or amend the judgment pursuant to M.R.C.P. 59, which was denied by the chancellor. Burns and Journeay thereafter filed their notice of appeal on *Page 1153 
May 3, 2005, and Berry cross-appealed on the issue of attorneys' fees and costs on May 10, 2005. On August 18, 2005, the chancellor set a supersedeas bond as a requirement for staying the chancery court's judgment.
 STANDARD OF REVIEW ¶ 10. An appeal from summary judgment is reviewed de novo.Jacox v. Circus Circus Miss., Inc., 908 So.2d 181,183 (¶ 4) (Miss.Ct.App. 2005) (citing Cossitt v. Alfa Ins.Corp., 726 So.2d 132, 136 (¶ 19) (Miss. 1998)). The standard by which we review the grant or denial of summary judgment is the same standard as is employed by the trial court under Rule 56(c) of the Mississippi Rules of Civil Procedure.Id. (citing Dailey v. Methodist Med. Ctr.,790 So.2d 903, 906-07(113) (Miss.Ct.App. 2001)). Pursuant to M.R.C.P. Rule 56(c), summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." The evidence must be viewed in the light most favorable to the non-moving party.Jacox, 908 So.2d at 184 (¶ 4).
 LAW AND ANALYSIS
I. WHETHER THE COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF BERRY.
 ¶ 11. Burns and Journeay argue that the lower court erred by granting summary judgment in favor of Berry, because there is no legal or factual basis to support the finding that Burns and Journeay are bound by the restrictive covenants.
A. Whether filing under the wrong corporate name invalidated the deed transfers and restrictive covenants.
 ¶ 12. The original deed conveyance and restrictive covenants recorded in the real property general index for the county incorrectly listed the grantor and declarant as "L.O.M. Corporation," instead of the correct name, "L.O.M. Properties, Inc." Burns and Journeay argue that the misnomer invalidates the deeds and covenants, and therefore, the covenants do not run with the land and do not bind any of the subsequent landowners. We disagree.
 ¶ 13. Section 89-5-33(3) of the Mississippi Code Annotated (Rev. 2006) provides guidance for an instrument relating to real property to be recorded in the county's general index:
 To be accepted for recording, an instrument shall state the name, address and telephone number of the person, entity or firm preparing it. The fact that the indexing instruction or preparer information may be omitted, incorrect, incomplete or false shall not invalidate the instrument or the filing thereof for record.
 ¶ 14. On August 4, 1997, the subdivision plat for Buckingham subdivision was filed in the Rankin County land records. At the same time, the protective covenants for the subdivision were also filed. The protective covenants and deed transfer incorrectly listed the property owner's company as "L.O.M. Corporation," instead of the correct title, "L.O.M. Properties, Inc." Burns and Journeay argue that the protective covenants were invalid and unenforceable because the name under which the covenants were filed was a non-existent corporation. While we agree that "L.O.M. Corporation" is not the equivalent of "L.O.M. Properties, Inc.," we find that the misnomer did not invalidate the protective covenants.
 ¶ 15. For a warranty deed, "All the law requires is that the grantee be described in such terms that by reference to objective evidence otherwise available, *Page 1154 
his identity may be ascertained with reasonable certainty."Garraway v. Yonce, 549 So.2d 1341, 1342 (Miss. 1989). Upon conducting a records search, the identity of L.O.M. Properties, Inc. was reasonably ascertainable. "L.O.M. Corporation" did not exist at the time of the original conveyance. The only legal entity registered in Mississippi whose name began with "L.O.M." or "LOM" was "L.O.M. Properties, Inc." Thus, if one were to enter a search for "L.O.M. Corporation," L.O.M. Properties, Inc. should have been included in the list of possible matches.
 ¶ 16. In addition, the owners of the subdivision, Michael Greene and "Boo" Baker, intended that the restrictive covenants be recorded as "L.O.M. Properties, Inc." Once Greene was alerted to the problem of the incorrect name on the original deeds, he immediately remedied the situation by preparing new deeds with the correct name, although the protective covenants do not seem to have been amended accordingly. Greene admitted in his affidavit that the wrong company name was used initially, but it was his intent and understanding that the property conveyed would be subject to the protective covenants and that once he made the correction to the original deeds, he intended that they be subject to the restrictive covenants already on file under "L.O.M. Corporation."
 ¶ 17. After the initial filing of the original warranty deed, deed transfers were made to ten different purchasers of lots in the Buckingham subdivision. All of those deed transfers were subsequently corrected with the proper corporate name. In addition, the corrected deeds contained an express provision which stated that the conveyance was subject to all applicable restrictive covenants, and all of the initial purchasers of Buckingham lots received a copy of the restrictive covenants.
 ¶ 18. When Burns and Journeay purchased their lots from the original lot owners, the corrected deeds had already been issued. Therefore, even if the incorrect name could have invalidated the original deed and protective covenants, any defect would have been cured by the time Burns and Journeay purchased their own lots.
 ¶ 19. Therefore, we find that the misnomer in the original deed transfer did not invalidate the restrictive covenants, and even if it had, the developer followed the necessary steps to correct the defect. Accordingly, Burns's and Journeay's argument that the deed transfers were invalid is without merit.
 B. Whether the covenants run with the land and therefore bind Burns and Journeay to the "visual barriers" restriction.
 ¶ 20. Our next inquiry is whether the restrictive covenants ran with the land and, therefore, bound subsequent purchasers of the property.
 ¶ 21. Our supreme court has held that a covenant must meet the following criteria to run with the land: "(1) the covenanting parties must intend to create such covenant; (2) privity of estate must exist between the person claiming [sic] right to enforce the covenant and the person upon whom burden of covenant is to be imposed; and (3) the covenant must `touch and concern' the land in question." Hearn v. Autumn Woods OfficePark Property Owners Ass'n, 757 So.2d 155, 158 (¶ 12) (Miss. 1999). "Covenants which run with the land may be enforced by subsequent assignees or successors in title to the original parties." Griffin v. Tall Timbers Develop., Inc.,681 So.2d 546, 550 (Miss. 1996) (citing White v. Miss. Power Light Co., 196 So.2d 343 (Miss. 1967) (where a covenant runs with the land, the *Page 1155 
covenant may be enforced by a member of a class of persons for whose benefit the deed is made although he is not a party to the instrument)).
i. Intent
 ¶ 22. As stated above, the developer intended the covenant to run with the land as evinced by the language in the Declaration of Covenants. The relevant wording in Article 17 of the Covenants is as follows: "These covenants are to run with the land and shall be binding on all parties and all persons claiming under them for a period of thirty (30) years from the date these covenants are executed, after which time said covenants shall be automatically extended for successive period of ten (10) years. . . ."
 ¶ 23. Greene and Baker also testified that they intended to make lots 1 through 61 of Buckingham subject to the restrictive covenants on file. After recording the covenants, Greene and Baker deeded the property to their realty company with the understanding that the property would be subject to the covenants. Likewise, the deed transfers contain language stating that the property is subject to all applicable restrictive covenants. Moreover, Ronnie Richardson, a real estate agent who helped develop the covenants, testified in his affidavit that he had each new lot owner sign a copy of the covenants at closing, acknowledging their receipt and agreement to abide thereby.
 ¶ 24. In addition, the granting clause of the covenants states that "said owners hereby covenant and agree with any and all purchasers and owners of a lot or lots in Buckingham Subdivision, that the following protective and restrictive covenants shall apply to all lots of said Subdivision[.]" Clearly, the intent of the developers as well as the purchaser was that any property transfer be subject to the restrictive covenants on record.
ii. Privity of Estate
 ¶ 25. Furthermore, privity of estate was established when Greene and Baker initially sold lots 59 and 60 to the Milners and lot 61 to the Stricklins. Each lot owner received a copy of the restrictive covenants and agreed to be bound by them. The original lot owners of lots 59 and 61 both received and agreed to be bound by the protective covenants when they purchased their lots. They were told that their title was subject to those covenants, provided a copy of the covenants and signed the covenants. Therefore, they had actual notice of the covenants. Subsequently, lots 59, 60 and 61 were sold to Burns, Berry and Journeay, respectively. Because the lots have been sold, the current owners have both the burden of the covenants and the benefit of the right to enforce them.
iii. Touches and Concerns the Land
 ¶ 26. The covenant prohibiting visual barriers also touches and concerns the land. In order for a covenant to touch and concern the land, it "must be so related to the land as to enhance its value and confer a benefit upon it, or, conversely, impose a burden on it." Vulcan Materials Co. v.Miller, 691 So.2d 908, 914 (Miss. 1997). The relevant language of Article 11 states:
 No wall or lot enclosure may project to a point nearer the street than the front setback line, of adjoining property. . . . No fence shall be constructed on any lot of the subdivision, nearer the street than the rear wall of any residence constructed on a lot. . . . Fences erected on water front lots may not be erected within 25 ft. of the water's edge.
By restricting certain structures which would be inconsistent with the development *Page 1156 
scheme, the covenants protect the character of the subdivision. Therefore, the restrictions do touch and concern the land.
 ¶ 27. Journeay further argues that the deed from his predecessor-in-title does not reference the restrictive covenants and therefore does not bind him to the covenants. However, "A covenant that runs with the land is enforceable against a subsequent owner, even if that covenant is not referenced in the subsequent owner's deed." Hearn,757 So.2d at 158 (¶ 14). Burns concedes that he was aware of the restrictive covenants, but that he only agreed to be subject to them pending the approval of the plans to build a cabana and swimming pool. Even if Burns only agreed to be subject to the covenants pending approval of his plans, the ARC did approve Burns's plan for a cabana and pool. Thus, Burns was subject to the enforcement of the covenants. As successors to the original contracting parties, Journeay and Burns had actual notice of the covenant restrictions. Thus, Burns and Journeay are both clearly bound by the covenants. Perry v. Bridgetown Community Ass'n,Inc., 486 So.2d 1230, 1234 (Miss. 1986) (signature of lot owners or predecessors to covenants is actual notice of restrictions and liability).
 ¶ 28. Burns and Journeay also had constructive notice of the protective covenants. Our supreme court has held that a prior recorded deed gives a subsequent grantee constructive notice of that deed and its provisions. Hearn,757 So.2d at 158 (¶ 14). In the present case, the protective covenants were previously filed in the Declaration of Covenants before any lot owners were granted their deeds. A plat was filed in connection with the declaration, and the lots were sold by reference to the plat. The original deed conveyances, as well as the corrected versions, contained provisions which expressly stated that the property was subject to all applicable restrictive covenants.
 ¶ 29. We find that Burns and Journeay are bound by the restrictions. "Restrictions placed by the grantor on the use of property conveyed will be enforced if the intent to create them is clear, and if they are not contrary to law or public policy and are reasonable." Carter v. Pace, 227 Miss. 488,494, 86 So.2d 360, 362 (1956). Both Greene and Baker, the original developers, testified that their intent was to burden all of the Buckingham lots with the covenants. Thus, Burns's and Journeay's argument in this regard is without merit.
C. Whether the Homeowners Association Board or the ARC has the authority to permit single-lot variances.
 ¶ 30. Burns and Journeay contend that they were given single-lot variances for their fences by Baker, the Board, and/or the ARC. The original restrictive covenants do not contain a specific provision for a property owner to seek and obtain a variance to any of the property restrictions. However, as a general practice, Journeay asserts that the Board and the ARC allowed property owners to obtain variances from the enforcement of certain covenants against conditions on their property. For instance, Jimmy Wilkins submitted an affidavit stating that he was a Buckingham resident who was granted a variance to build a four-car garage, which was a larger garage than what was allowed in the restrictive covenants.
 ¶ 31. The Homeowners Association, the Board and the ARC review process are creatures of the covenants. The Association was formed in 2001. It promulgated procedures for voting on any other changes, rules, additions, or proposals *Page 1157 
to the covenants. "When covenants provide for a subdivision association to be formed, then the owners are on notice and they are obligated to comply with the rules and the bylaws of that association as long as they are consistent with the covenants themselves." See Griffin, 681 So.2d 546;Perry, 486 So.2d 1230.
 ¶ 32. Journeay asserts and testimony corroborates that Boo Baker, one of the original developers, attempted to verbally grant Journeay a single-lot variance for his fence. The fence violated the covenants. Baker testified that he had the right as the developer to make changes to the covenants as he saw fit until a homeowner association was formed. However, no provision exists in the covenants to grant such authority. The only provision which comes close to granting such authority is in Article 4, which states in relevant part:
 In order to ensure that all structures shall comply with these restrictions, two sets of the proposed plans and specifications for each building, mailbox, culvert placement, on-site parking, and driveway (concrete, paved, or slag) specifications are to be submitted to Declarants, their agents, successors and/or assigns, for review and approval, prior to the starting of any building, erection, or placing; such plans to be in sufficient detail to illustrate conformity with these specifications and decorations. . . . Plans and specifications must be submitted to the Declarants or their representative until 40 lots of Buckingham Subdivision have been conveyed by Declarants to third parties, at such time the Buckingham Subdivision Property Owners Association will then delegate a committee of three persons, by majority vote of the said members of said association, to approve any such plans.
Article 4 makes no mention of exceptions to the restrictions. As it states, the purpose of the provision is to "ensure that all structures shall comply with these restrictions." Moreover, Baker testified that the reference to "building," was not intended to include a fence. In addition, Journeay never submitted any plans or specifications for a fence to Baker. Yet, Baker stated that he did give Journeay oral approval for the fence. However, the covenants do not provide any authority for approving a violation of the restrictions.
 ¶ 33. After the Board was formed, Journeay also requested permission from the Board to build a fence to surround his pool. The fence came within twenty-five feet of the water's edge and was violative of the covenants. Minutes from the Board's meeting on May 16, 2002, show that Journeay was denied his request. Regardless of the denial, Journeay built his fence and was later sent a letter from the Board regarding his willful violation.
 ¶ 34. Burns also argues that he was granted a single-lot variance from the ARC when it approved his plans for a pool and cabana. However, upon review of the plans submitted to the ARC, it does not appear to contain a visual drawing or specifications for a fence. In addition, Berry testified that he verbally warned Burns that litigation was pending against Journeay for building a fence which extended into the water. Burns moved forward with constructing his fence despite the warning.
 ¶ 35. Berry asserts that single-lot variances defeat the purpose of the general scheme of development embodied in restrictive covenants. Berry cites PMZ Oil Co. v.Lucroy, 449 So.2d 201, 207-08 (Miss. 1984) as holding that under the doctrine of equitable estoppel, a subdivision's developer may not be allowed to disregard the covenants it has already imposed on lot owners. In PMZ, the court stated: *Page 1158 
 [E]vidence is uncontradicted that PMZ made similar representations to all lot purchasers in the Raintree Subdivision. The same covenants were included in every other deed to a third party. Without exception, PMZ had represented that these covenants would apply to all lots in the Raintree Subdivision. . . . These facts are more than sufficient to undergird the Chancery Court's enforcement of an estoppel against PMZ.
Id.
 ¶ 36. Neither Burns nor Journeay cite any case to rebut the aforementioned position. Yet the facts in the present case are clear. Greene and Baker constructed the covenants to run with the land and bind all subsequent lot owners. All of the initial lot owners relied upon the provisions of the covenants and agreed to abide by them. The covenants did not contain a provision authorizing single-lot variances. However, the covenants did provide for a procedure to be followed to amend the covenants, which we will discuss below. Therefore, we find that neither the Board, ARC or developers had the authority to grant any single-lot variances.
D. Whether Burns and Journeay effectively "amended" the covenant restrictions for visual barriers.
 ¶ 37. Our next inquiry turns to whether any "amendments" to the covenants ratified Burns's and Journeay's fence violations. Burns and Journeay claim that they effectively obtained approval for their fences by formulating a Declaration of Consent petition signed by over 75% of the lot owners. We disagree.
 ¶ 38. No provision exists in the covenants for granting an individual variance to ratify a covenant violation. However, the covenants do provide for procedures to amend the covenants, and for review of covenant violations. Article 17 of the Covenants provides:
 Term. These covenants are to run with the land and shall be binding on all parties and all persons claiming under them for a period of thirty (30) years from the date these covenants are executed, after which time said covenants shall be automatically extended for successive period of ten (10) years, unless an instrument signed by seventy-five (75%) percent of the then owners of the lots shall have been executed, agreeing to change the covenants in whole or in part; likewise any provision or term of these declarations may be amended at any time in the same fashion and by the same procedure. Owners could attend the Board meeting or vote by proxy. If a quorum is present at the meeting (including proxies), a vote may be taken, but if a quorum is not present, another meeting may be called. The results of the vote are to be recorded, and all property owners are to be notified by certified mail.
 ¶ 39. We defer to the language provided in the covenants because, "When a contract is clear and unambiguous on its face, its construction is a matter of law, and not fact, and must be construed and enforced as written." Griffin,681 So.2d at 551.
 ¶ 40. Pursuant to the covenants, the Board adopted additional procedures for amending the covenants. Under these procedures, property owners are to be provided, by certified mail, written information, not less than five days and not more than thirty days before the Board meeting, indicating the date and time of the meeting and agenda and specifics on what the vote will concern. The Board also adopted procedures for a request by a property owner for a review or action by the Board. If the request concerns a violation *Page 1159 
of the covenants, the Board must provide written notice to the lot owner of the violation, stating the violation and the time frame allowed for correction.
 ¶ 41. Burns and Journeay took measures to attempt to "amend" the covenants by personally soliciting signatures from residents of the subdivision to change the community bylaws. Fifty Declarations of Consent were signed by lot owners. Each declaration was signed by a single owner; thus, no jointly owned lots had the signatures of both owners. The Declaration of Consent included language that changed Article 17 of the covenants to allow singlelot variances pending either (1) Board approval or (2) written approval of not less than 75% of the owners of the "then owners" of the lots. The form also contained a provision which expressly permitted Burns and Journeay to keep their fences, subject to approval by 75% of the lot owners.
 ¶ 42. Burns and Journeay did not follow the procedure established by the Board. They did not inform the Board or property owners in writing or attempt to set a homeowners association meeting to assess the votes. It appears that the parties attempted to circumvent the established process by the Board in order to perfect their personal and willful violation of the existing covenants.
 ¶ 43. Furthermore, Article 11 of the protective covenants is clear and unambiguous as to how and where a fence may be constructed on any lot of the subdivision. Burns and Journeay did not amend, modify or attempt to amend or modify Article 11. Therefore, their fences remain in violation of Article 11.
 ¶ 44. Because this issue was one of contract interpretation and therefore a question of law, the lower court was correct in its interpretation of the covenants, and in finding that Burns and Journeay did not correctly amend the covenants. Therefore, Burns's and Journeay's arguments on this issue are without merit.
II. WHETHER THE CHANCELLOR'S DENIAL OF THE RULE 56(F) REQUEST FOR ADDITIONAL TIME DENIED BURNS AND JOURNEAY A FAIR OPPORTUNITY TO RESPOND TO BERRY'S SUMMARY JUDGMENT MOTION.
 ¶ 45. Burns and Journeay argue that the chancellor's denial of their Rule 56(f) request for additional time denied them a fair opportunity to respond to Berry's cross-motion for summary judgment. Burns and Journeay assert that Berry's cross-motion extended beyond the issues argued in the original summary judgment motion, because of factual and legal issues that were unrelated to the specific issues raised in their own motion.
 ¶ 46. Burns and Journeay state that their own summary judgment motion focused on one narrow issue: whether the covenants were valid and enforceable given that they were filed under a non-existent corporate moniker. However, Berry's cross-motion for summary judgment included additional issues. Journeay and Burns desired an opportunity to depose Berry, whom they claim may have approved granting certain variances in his position on the Board of Directors, which would preclude the suit by employing equitable estoppel principles.
 ¶ 47. M.R.C.P. 56(f) provides as follows:
 Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or *Page 1160 
discovery to be had or may make such order as is just.
Burns and Journeay requested that the court reserve hearing arguments on Berry's cross-motion for summary judgment until after the court had ruled on their own motion for summary judgment. The court denied that request and went on to grant Berry's cross-motion for summary judgment.
 ¶ 48. It is within the court's discretion whether to permit or deny a Rule 56(f) motion. Marx v. Truck Renting andLeasing Ass'n Inc., 520 So.2d 1333, 1343 (Miss. 1987). "[T]he party resisting summary judgment must present specific facts why he cannot oppose the motion and must specifically demonstrate" how he would be able to rebut the "movant's showing of the absence of a genuine issue of material fact."Id. at 1344.
 ¶ 49. We find nothing in the record to indicate that the chancellor abused his discretion in denying Burns's and Journeay's 56(f) motion. Berry filed the case against Journeay on February 25, 2003, and added Burns to the amended complaint on April 6, 2004. Burns filed a motion for summary judgment on August 10, 2004, and Berry responded on August 17, 2004, with a cross-motion for summary judgment. No discovery requests or notice to depose Berry were filed by Burns or Journeay. Therefore, we find that sufficient time passed in which neither Burns nor Journeay attempted to avail themselves of the discovery process. Accordingly, we find this issue to be without merit.
III. WHETHER THE CHANCELLOR'S DENIAL OF THE RULE 59 MOTION WAS ERRONEOUS.
 ¶ 50. Burns and Journeay argue that the chancellor abused his discretion by denying their Rule 59(e) motion to set aside his order and allow discovery to proceed because they were denied the opportunity to develop additional evidence.
 ¶ 51. The grant or denial of a Rule 59 motion is within the discretion of the judge and we will not reverse the denial absent an abuse of discretion or if allowing the judgment to stand would result in a miscarriage of justice. Clark v.Columbus Greenville Railway Co., 473 So.2d 947
(Miss. 1985). M.R.C.P. 59(e) provides for a motion to alter or amend a judgment. In order to succeed on a Rule 59(e) motion, the movant must show: (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or to prevent manifest injustice. Brooks v. Roberts,882 So.2d 229, 233 (¶ 15) (Miss. 2004).
 ¶ 52. Burns and Journeay argue that after the Board's vote on January 13, 2003, to amend Article 5 of the covenants, the vote provided new evidence to bolster their case. We disagree. The original language of Article 5 stated, "The minimum setback line or building setback line for all residences shall be 25 ft." The change added that the minimum setback line would still be twenty-five feet from adjoining property lines and seventy-five feet from the edge of the right-of-way line. An exception was provided for the lots along Fannin Landing Road, where the minimum setback lines could be less than seventy-five feet, but that was "subject to the A.R.C. approval." Burns and Journeay claim that the new language provides that the Board approved a single-lot variance.
 ¶ 53. In addition, Burns and Journeay argue that a question has arisen as to whether Berry, who may have attended the Board meeting approving the language change to Article 5, voted for the amendment. They claim that had they been able to depose Berry on this issue, an equitable *Page 1161 
estoppel defense could have been pursued, preventing Berry from denying the validity of other single-lot variances.
 ¶ 54. First, we are unable to see how the new language in Article 5 is relevant to any of the parties. None of the lots involved in the present case sit on Fannin Landing Road. The setback lines referenced in Article 5 apply to building setbacks, which we have already stated do not involve "fences." A separate provision for fences applies to Article 11.
 ¶ 55. Likewise, even if Berry did vote for the amendment, an equitable estoppel theory would not apply to the argument. Equitable estoppel "requires a representation by a party, reliance by the other party, and a change in position by the relying party." Westbrook v. City of Jackson,665 So.2d 833, 839 (Miss. 1995). A vote by Berry would not meet any of these three elements. In addition, a proposed amendment granting single-lot variances had already failed when put to a vote before the homeowners association. Finally, neither Burns nor Journeay filed a discovery order to depose Berry on this issue. Therefore, we find this issue to be without merit.
IV. WHETHER THE SUPERSEDEAS BOND REQUIRED BY THE CHANCERY COURT WAS PROPER AND WHETHER ITS AMOUNT SHOULD HAVE BEEN REDUCED.
 ¶ 56. The chancellor included in his final order, suasponte, a $50 per day penalty from the 90th day after the entry of the judgment if Burns or Journeay failed to comply with the injunction. Burns and Journeay filed a motion to stay that judgment penalty, pending appeal to the supreme court. Berry filed a cross-motion to require Burns and Journeay to file a supersedeas bond if the court granted the stay. The court granted the stay for the contempt order, but also required an $18,250 supersedeas bond.[1]
 ¶ 57. Burns and Journeay argue that under Mississippi Rule of Appellate Procedure 8(b), the final judgment is not a monetary judgment; therefore, the final order constitutes an improper penalty assessment. They further argue that the amount of the bond should not have exceeded the statutory maximum of $1,000. Berry maintains that the stay merely delays the enforcement of the protective covenants that the court found to have been clearly violated and that continue to be violated.
 ¶ 58. M.R.A.P. 8(b)(1) provides:
 Application for a stay of the judgment or the order of a trial court pending appeal or for approval or disapproval of a contested supersedeas bond . . . must ordinarily be made in the first instance to the trial court. The court shall require the giving of security by the appellant in such form and in such sum as the court deems proper, and for good cause shown may set a supersedeas bond in an amount less than the 125 percent required in cases under Rule 8(a).
The comments to Rule 8 further instruct that the purpose of the supersedeas bond is to "preserve the status quo while protecting the judgment creditor's rights pending appeal," and that the trial court should "endeavor to protect the prevailing party."
 ¶ 59. In Jenkins v. Jenkins, 757 So.2d 339,341 (¶ 3) (Miss.Ct.App. 2000), this *Page 1162 
Court affirmed the lower court's order in which a supersedeas bond was required for an appeal from its judgment requiring a partition of a land tract. In addition to ordering partition of the land, the chancery court issued an injunction requiring the appellants to remove their trailers from the appellee's land. The injunction was conditioned upon the appellant's posting of the supersedeas bond. When the appellants posted that bond, the court stayed the injunction. In Moreland v. Riley,537 So.2d 1345, 1347 (Miss. 1989), our supreme court held, "Where the appeal is without supersedeas, the successful party may proceed to execute on the lower court decree." Therefore, a supersedeas bond is still proper even where the relief appealed is nonmonetary, such as injunctive relief.
 ¶ 60. Burns and Journeay further argue that the supersedeas bond exceeds the statutory maximum of $1,000 pursuant to Mississippi Code Annotated Section 11-51-12 (Rev. 2002). Section 11-51-12 sets a statutory maximum for appeals from a judgment of civil contempt, which should not exceed 125% of the sum the person has been adjudicated in contempt for failure to pay. A statutory maximum for $1,000 is set forth under Section 11-51-11
(Rev. 2002), which provides for appeals from a criminal contempt judgment. Miss. Code Ann. § 11-51-11.
 ¶ 61. In the present case, the lower court did not make a final judgment of civil or criminal contempt against Burns and Journeay. The court stated that if Burns and Journeay did not comply with the final order within ninety days, then they would be in contempt and subject to a civil fine or penalty of $50 for each day not in compliance. Therefore, we again refer to Rule 8(b) of the Mississippi Rules of Appellate Procedure, which states that, "[t]he court shall require the giving of security by the appellant in such form and in such sum as the court deems proper, and for good cause shown may set a supersedeas bond in an amount less than the 125 percent," of the amount of the judgment appealed from.
 ¶ 62. We find that the court did not abuse its discretion in ordering the amount to be paid for the supersedeas bond. Accordingly, this issue is without merit.
 ISSUE ON CROSS-APPEAL
I. WHETHER BERRY SHOULD HAVE BEEN AWARDED REASONABLE ATTORNEYS' FEES.
 ¶ 63. Berry cross-appeals that the judge erred in denying him attorneys' fees. As the "prevailing party," Berry asserts that he was due attorneys' fees based on the wording in Article 18 of the Buckingham covenants. Article 18 provides in pertinent part:
 In any legal or equitable proceeding for the enforcement or to restrain the violation of these Protective Covenants or any provisions hereof by reference to otherwise [sic], the prevailing party or parties shall also be entitled to an award of reasonable attorneys' fees and costs, in such amount as may be fixed by the Court in such proceeding from the non-prevailing party or parties, including the costs of any expert witness.
 ¶ 64. We review a grant or denial of attorneys' fees under an abuse of discretion standard. Mauck v. Columbus HotelCo., 741 So.2d 259, 269 (¶ 32) (Miss. 1999). However, our supreme court has stated that "unless a statute or contract provides for the imposition of attorney fees, they are not recoverable." Hearn, 757 So.2d at 164. In addition, "parties may by contract provide that in event of dispute, the losing party must pay the winner attorney's fees." Grishamv. Hinton, 490 So.2d 1201, 1206 (Miss. 1986). *Page 1163 
 ¶ 65. Berry asserts that the chancellor abused his discretion by ignoring the manifest provisions of Article 18 in the restrictive covenants. The relevant contract provision is unambiguous. The clause provides that, "In any legal or equitable proceeding . . ., the prevailing party or parties shall also be entitled to an award of reasonable attorneys' fees and costs[.]"
 ¶ 66. As we stated above, the restrictive covenants for the Buckingham subdivision were valid, ran with the land, and subsequently bound each successor in interest. Therefore, the contract provision of Article 18 should be upheld and attorneys' fees should be awarded to Berry as the prevailing party. Accordingly, we reverse on this issue and remand to the chancery court for a determination of reasonable attorneys' fees and costs.
 ¶ 67. THE JUDGMENT OF THE CHANCERY COURT OF RANKINCOUNTY IS AFFIRMED ON DIRECT APPEAL AND REVERSED AND REMANDED ONCROSS-APPEAL FOR A DETERMINATION OF ATTORNEYS' FEES CONSISTENTWITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THEAPPELLANTS AND THE CROSS-APPELLEES.
KING, C.J., LEE AND MYERS, P.JJ., ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. IRVING AND BARNES, JJ., CONCUR IN RESULT ONLY. GRIFFIS, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.
[1] The amount of the bond was computed by multiplying $50, which is the day rate of penalty for each day the court's order was not complied with, times 365 days, which is the number of days the appellate process was reasonably expected to be completed.