541 So.2d 1031 (1989)
WHITE CYPRESS LAKES DEVELOPMENT CORPORATION
v.
Carol and Gerald HERTZ; Irvin Massett; Trena Hoffmann; Cliff and Edson Osmer; Manuel and Eva Nicosia; Lauren Buck; Noel Genis; Hildrey and Lydia Wilson; Michael and Susanne Gorbach; George and Marie Rose; Curtis Griffin; Pascal Palmisano and Johnnie Palmisano; and Malcolm and Roseanne Patterson.
No. 58321.
Supreme Court of Mississippi.
March 29, 1989.
*1032 John L. Galloway, Galloway & Galloway, Gulfport, for appellant.
Peter C. Abide, Floyd G. Hewitt, Jr., Compton, Crowell & Hewitt, Biloxi, for appellees.
Before HAWKINS, P.J., and ROBERTSON and PITTMAN, JJ.
ROBERTSON, Justice, for the Court:

I.
This action arises from a complaint by homeowners in a "quality" residential subdivision in Hancock County seeking to enforce against the development company certain restrictive covenants in a planned-as-quality sister subdivision. The development company precipitated the dispute when it changed horses in midstream and began using unsold lots in the sister subdivision as a recreation vehicle (RV) campground. The Court below enjoined that use.
We hold that the homeowners have standing to sue, that the RV campground is not a use permitted under the covenants and that, by reason of its predecessor's marketing strategy, the development company is equitably estopped to vacate the plat and engage in the use. We affirm.

II.

A.
In the spring of 1977 L & A Contractors began work on a recently acquired 3,600 acre tract of land in Hancock County which surrounded White Cypress Creek. Various tributaries of the creek were dammed, creating a number of lakes and ponds. The largest of these man-made bodies of water is Lake Cypress, which covers 120 acres.
In 1980, after the first 280 acre subdivision (known as "Woodhaven") had been platted and sold, a group of investors led by Talmadge D. Bickham, Jr., organized as "Talmar, Inc," purchased the entire project. Talmar continued to develop the area, particularly the land around Lake Cypress. Bickham commissioned a "Master Plan" to be drawn up by a local civil engineer. This master plan called for the entire subdivision to be developed in phases, thirteen in all.
The area surrounding Lake Cypress, denominated "Mallard Point" Phases I through VI, was the first area subdivided and developed. Plats of Mallard Point Phases I through V, and restrictive covenants covering each specific plat, were recorded in the land records of Hancock County on August 14, 1980. The lots in Mallard Point varied in size, but all were a minimum of three acres.
The master plan also recognized the demand for smaller lots. The land immediately east of the Mallard Point area bordering the 64 acre, man-made "Quail Ridge Lake" was subdivided into lots averaging one acre in size. The plats and restrictive covenants for "Quail Ridge Estates," Phases I & II (and the rest of the White Cypress Lakes development) were completed by December, 1981. At this same time, the plat and covenants for Mallard Point, Phase VI, were finalized and recorded. The ownership of the platted land was transferred to Talmar, Inc., while title to the property kept for future subdivision was held by Bickham personally.
Sales of the lake-front lots at White Cypress Lakes commenced in 1982. Most of the homeowner plaintiffs in this action purchased *1033 their property in 1982 and 1983. Promotional literature for the development included the following representations:
The basic difference between White Cypress Lakes and other rural developments is that its land is measured in acres instead of feet. White Cypress is an acreage development ... no tract can be subdivided... . Talmar, Inc. has zoned each area of the huge development for its most suitable use. The zoning plans assure owners that quality will surround them. The types of structures and the uses of those structures are designated in each area.
After the first eleven phases of White Cypress Lakes had been substantially completed and most of the lots sold, Talmadge Bickham died. By deed dated January 31, 1985, Bickham's estate transferred all of the unsold lots in White Cypress Lakes as well as the surrounding undeveloped land to the newly-formed "White Cypress Lakes Development Corporation" (hereinafter "the development company"). The group of investors organizing this corporation included some of Bickham's business associates who had worked with him on the White Cypress Lakes project. This new development company thus assumed ownership of the entire portion of White Cypress Lakes designated as Mallard Point Phase V, comprised of thirty-two lots, averaging three and one-half acres each. Phase V also included over 2,000 feet of frontage on the western shore of Lake Cypress, including an area which was designated on the master plan as a ten acre recreation site.
The development company soon made known its plans for Mallard Point, Phases V and VI  an RV campground affiliated with a nation-wide association of resort campgrounds, "Camp Coast-to-Coast".[1] The development company began the excavation and clearing of the RV campground in the summer of 1985.

B.
On November 21, 1985, Carol and Gerald Hertz and twenty-one other White Cypress Lakes homeowners commenced this civil action by filing their complaint in the Chancery Court of Hancock County. Plaintiffs sought to enjoin any further development of the campground, claiming it was in violation of the recorded protective covenants for Mallard Point, Phases V and VI.
Rather than await a judicial determination, the development company continued to build the campground facility  pouring concrete parking "pads" (ten to the acre) and installing electrical hook-ups. The campground opened for business in early 1986.
On January 2, 1986, the development company responded to the homeowners suit by filing a separate action, a Petition to Vacate Plat. The petition similarly sought to vacate the protective covenants for Mallard Point, Phases V and VI. By order dated June 27, 1986, the two actions were consolidated for trial. See Rule 42(a), Miss. R.Civ.P.
On August 21, 1986, trial began. The testimony and argument were directed toward two essential issues. First, to what degree did the recorded covenants permit the developer to conduct commercial ventures upon the unsold lots? Second, did the plaintiff landowners have any right to enforce the covenants burdening phase V and VI of Mallard Point, as their property was technically not a part of either of those platted subdivisions?
Although the covenants for the various phases of Mallard Point are not worded identically, the language employed is distinctly similar. In relevant part the covenants of each subdivision read:
1. No lot shall be used for other than residential purposes (except as elsewhere herein provided), and no soil or trees shall be removed for any commercial use... .
2. No building shall be erected on any lots other than one single-family dwelling or cottage with garage... .
* * * * * *

*1034 4. No structure of a temporary character, trailer, mobile home, basement, camping vehicle, tent, shack, garage, or other outbuilding shall be used on any lot at any time as a residence, either temporarily or permanently... . Written approval may be obtained from TALMAR, INC. for the use of the property as a temporary weekend campsite subject to such vehicle being commercially manufactured and licensed.
* * * * * *
9. No noxious, immoral, illegal or offensive activity shall be carried on upon any lot, nor shall anything be done thereon which may be or become an annoyance or nuisance to the subdivision in which said lot is located or to the inhabitants thereof.
* * * * * *
13. Notwithstanding anything to the contrary contained herein, TALMAR, INC. reserves for itself, its successors and assigns and its designated agent or agents the right to use any unsold lot or lots for temporary office locations or commercial endeavors and to place a sign or signs on any unsold lot in the subject subdivision, ...
14. These restrictions, covenants and conditions may be enforced by TALMAR, INC., and/or White Cypress Lake Property Owners' Association herein or by the owner of any lot in said subdivision by proceedings either at law or equity or for injunction ...
* * * * * *
16. No platted lots in the subdivision shall be subdivided into smaller lots.
* * * * * *
20. No lot shall be used for any commercial purposes without the written approval of TALMAR, INC., its successors or assigns.
On January 8, 1987, the Chancery Court of Hancock County held for Plaintiff homeowners, enjoining the development company from continuing to use Mallard Point Phases V and VI as a campground. The Court held that, although the various phases of the White Cypress Lakes development were recorded on individual plats, the "individual subdivisions contained within the development known as White Cypress Lakes were developed according to a common scheme and pursuant to a systematic plan to be used for residential purposes only ..." The development company has now appealed the order of the Chancery Court.

III.
The development company argues that the plaintiff homeowners lack standing to sue. In so doing, they confuse standing to sue with the right to relief.
In the context of today's action, a White Cypress Lakes homeowner has standing to sue if he presents to the Court a colorable claim that the conduct of the development company has had, and is having, an adverse effect upon his property. See Luter v. Oakhurst Associates, Ltd., 529 So.2d 889, 892 (Miss. 1988); Barrett v. Ballard, 483 So.2d 304, 305 (Miss. 1985); Northwest Builders, Inc. v. Moore, 475 So.2d 153, 154 (Miss. 1985); McGuffie v. Duckworth, 208 So.2d 179, 181 (Miss. 1968); Parker v. Lewis Grocery Co., 246 Miss. 873, 895-96, 153 So.2d 261, 270-71 (1963). From a standing point of view, this action may have been brought either in the name of the White Cypress Lakes Property Owners Association or in the name of one or more individual homeowners possessing a colorable claim of adverse effect. See Belhaven Improvement Association, Inc. v. City of Jackson, 507 So.2d 41, 45-47 (Miss. 1987).
In their complaint Plaintiffs not unreasonably charged that the development of the RV campground has "damaged Plaintiffs' property rights by infringing upon the privacy of their homes as well as depreciating the value of their property." Beyond this, the complaint charges that users of the RV campground "have continuously trespassed on the property of Plaintiffs" and that "the unauthorized use of the lakes and common areas and trespassing constitute a continuing nuisance." The complaint finally charges that "unless restrained [the conduct of development company] will cause the Plaintiffs to suffer *1035 irreparable loss and damage to their homes and property." So seen, Plaintiffs have standing to sue.

IV.
In support of reversal, the development company argues that the restrictive covenants for Mallard Point, Phases V and VI, authorize commercial uses of the sort they have engaged in. To be sure, use as a commercial recreational vehicle campground contravenes the "residential use only" covenant. The development company points to Paragraph 13 of the covenants and argues that commercial uses of the unsold lots by the developer were contemplated by the parties to the covenants and should now be permitted. Paragraph 13 provides that "TALMAR, INC. reserves for itself, its successors or assigns ... the right to use any unsold lot or lots for temporary office locations or commercial endeavors ..." [Emphasis supplied] The development company now argues that the effect of this provision is "to permit the developer to do anything he wanted, including commercial activities, on the unsold lots".
The argument fails upon but a moment's thought. The proviso speaks of "temporary office locations or commercial endeavors", not permanent facilities such as the campground. It would strain credulity as well as the grammatical rules of the English language to reach the result sought by the development company  that the adjective "temporary" does not modify the phrase "commercial endeavors". See also A.A. Home Improvement Co., Inc. v. Hide-a-way Lake Club, Inc., 393 So.2d 1333, 1336 (Miss. 1981). Nothing in Kinchen v. Layton, 457 So.2d 343, 345 (Miss. 1984) is to the contrary. Indeed, Kinchen recognizes that the clear (albeit not necessarily perfectly clear) wording of protective covenants will not be disregarded merely because a use is restricted. See also Andrews v. Lake Serene Property Owners Association, Inc., 434 So.2d 1328, 1331 (Miss. 1983).

V.
The more serious question is whether Plaintiff homeowners have a right to relief in the form of injunctive enforcement of the covenants in Mallard Point, Phases V and VI when none of the plaintiffs own property in either of those two subdivisions. The development company's point, standing aside, is that the entire White Cypress Lakes development has been divided into thirteen separate and legally distinct subdivisions and that no property owner has any right to enforce the covenants outside the particular subdivision where that person owns property. Immediately prior to trial, the development company did indeed own all lots in Mallard Point, Phases V and VI and had then pending before the court a petition to vacate the plat in these two subdivisions.
The record before us is replete with evidence that the development company and, more particularly, its predecessor in title, substantially induced purchasers including these Plaintiffs to believe that all lots in the entire White Cypress Lakes development area would be used solely for single family homes located upon lots of at least one acre in size. "... [Q]uality will surround [you]." On these facts the development company is equitably estopped from using the lands in Mallard Point, Phases V and VI, in a manner inconsistent with the general representations it and its predecessors made in marketing the lots in the other phases of the White Cypress Lakes development. See Knight v. McCain, 531 So.2d 590, 596-97 (Miss. 1988); PMZ Oil Co. v. Lucroy, 449 So.2d 201, 208 (Miss. 1984).
It may be that only a handful of White Cypress Lakes' many homeowners object to the RV campground. No matter. The truculence of a single landowner, with or without justification, can prevail over those who propose to use realty in a prohibited manner.
Here, in the case at hand, no process of balancing the equities can make the plaintiff's the greater when compared with the defendant's, or even place the two in equipoise. The defendant, the owner has done nothing but insist upon *1036 adherence to a covenant which is now as valid and binding as at the hour of its making. His neighbors are willing to modify the restriction and forego a portion of their rights. He refuses to go with them. Rightly or wrongly he believes that the comfort of his dwelling will be imperiled by the change, and so he chooses to abide by the covenant as framed. The choice is for him only... . Other owners may consent. One owner, the defendant, satisfied with the existing state of things, refuses to disturb it. He will be protected in his refusal by all the power of the law.
Evangelical Lutheran Church of the Ascension of Snyder v. Sahlem, 254 N.Y. 161, 168, 172 N.E. 455, 457 (1930) (per Cardozo, C.J.). The principle holds as well where the homeowners' right to relief is grounded only in equitable estoppel.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
NOTES
[1] See First United Bank v. Philmont Corp., 533 So.2d 449, 451 (Miss. 1988).