CARLSON, Presiding Justice,
dissenting:
¶ 25. Because I disagree with the majority’s application of equitable estoppel in this matter, I respectfully dissent. The one issue raised in the petition for writ of certiorari is whether the chancery court and the Court of Appeals erred in applying the doctrine of equitable estoppel. Specifically, the Long Meadow Defendants contend that the chancery court and Court of Appeals failed to consider the testimony of landowners who relied on representations made by the Leavells that all lots in Long Meadow would be subject to the same restrictive covenants and that only single-family, residential structures would be permitted in the subdivision. I agree that the *580 chancery court and Court of Appeals erred in this regard.
I. Doctrine of Equitable Estoppel
¶ 26. I agree with the principles cited by the majority regarding equitable estop-pel,[4] and I will add the following. Equitable estoppel is “the principle by which a party is precluded from denying any material fact, induced by his words or conduct upon which a person relied, whereby the person changed his position in such a way that injury would be suffered if such denial or contrary assertion was allowed.” B.C. Rogers Poultry, Inc. v. Wedgeworth, 911 So.2d 483, 492 (Miss.2005) (quoting Dubard v. Biloxi H.M.A., Inc., 778 So.2d 113, 114 (Miss.2000) (quoting Koval v. Koval, 576 So.2d 134, 137 (Miss.1991))). This Court has said that the doctrine of equitable estoppel is rooted “in the morals and ethics of our society.” PMZ Oil Co. v. Lucroy, 449 So.2d 201, 206 (Miss.1984). “Whenever in equity and good conscience persons ought to behave ethically toward one another the seeds for a successful employment of equitable estoppel have been sown.” Id.
¶ 27. A party asserting equitable estop-pel must prove the following by a preponderance of the evidence: “(1) belief and reliance on some representation; (2) a change of position as a result thereof; and (3) detriment or prejudice caused by the change of position.” B.C. Rogers Poultry, 911 So.2d at 492. See also McCrary v. City of Biloxi, 757 So.2d 978, 981 (Miss.2000). Intentional misrepresentation is not required. Staton v. Bryant, 55 Miss. 261, 265 (1877) (“It is not necessary to an equitable estoppel that the party should willfully intend to mislead....”). “[T]he test is whether it would be substantially unfair to allow a person to deny what he has previously induced another to believe and take action on.” First Investors Corp. v. Rayner, 738 So.2d 228, 233-34 (Miss.1999) (internal citations omitted). A person will be subject to estoppel “if his acts, admissions, or representations were intended or calculated, or might be reasonably expected, to influence the conduct of another, and does so influence his conduct, and he would be prejudiced if the acts and admissions were allowed to be retracted.” Staton, 55 Miss. at 267.
¶ 28. Although this Court has pronounced the general principles of equitable estoppel, as reiterated here, the application of this doctrine will not be uniform in every case. “So varied are the relations and transactions of men, that equity ... has done no more in reference to estoppel by conduct than to announce the general principles by which it will be guided in applying it-leaving each case in which it may be invoked to be determined by its own peculiar circumstances.” Staton, 55 Miss, at 275. Under this framework, I will review the decisions of the chancery court and Court of Appeals and discuss the primary cases that have applied equitable estoppel in similar contexts.
II. Decisions of the Chancery Court and Court of Appeals and Discussion of Precedent Cases
¶ 29. The chancellor’s order included the following in regard to the Long Meadow Defendants’ equitable-estoppel defense:
There appears nothing in the public records of Lafayette County, Mississippi, upon which the Respondents [the Long Meadow Defendants] could rely for as *581 surances as to the restrictions of phase 3. The one exception to this would be the individual restrictive covenants attached to the deeds sold by the Leavells. As such, the Petitioners [the Harlands] herein when researching the public records of Lafayette County, Mississippi, were reasonable in determining that as no specific covenants in connection with phase 8 were recorded and other deeds conveyed by the Leavells allowed the construction of churches in phase 3, to rely thereon.
Long Meadow, 89 So.3d at 597 (¶ 21). I disagree with the chancellor’s analysis for several reasons. First, the chancellor cut short his analysis of reliance by the Long Meadow Defendants and switched to reliance by the Harlands. It is the Long Meadow Defendants’ reliance, as the party asserting equitable estoppel, that is relevant. Second, the chancellor noted that the Harlands were allowed to rely on deeds that allowed for construction of churches, but he did not address whether the Long Meadow Defendants were likewise allowed to rely on the deeds that prohibited anything other than strictly residential structures. Third, his conclusion that the Harlands were reasonable in determining that a church could be built because no specific covenants pertaining to Phase III had been recorded directly contradicts the language in the option contract, which evidences that the Harlands knew that building a church was prohibited under the restrictive covenants. Finally, the order does not include any indication that the chancellor considered the Long Meadow Defendants’ testimony regarding representations made by the Lea-vells.
¶ 30. Like the chancery court, the Court of Appeals failed to consider the Leavells’ representations to the landowners. The Court of Appeals found that the chancellor did not err in finding that equitable estoppel did not apply, because no covenants were recorded with respect to Phase III and because, prior to the Har-lands’ purchase, several individual deeds within Phase III had allowed for construction of a church. Id. at 596-97 (¶ 22). The emphasis by the Court of Appeals, and by the majority here, on the other deeds that at one time permitted a church is misplaced. When the Harlands purchased Lots 2, 3, and 4, in March 2007, the covenants for all of Phases I and II, and half of the lots in Phase III (Lots 1, 7, 8, 9, and 10) permitted only one single-family, residential structure on each lot. At that time, only four lots in Phase III (Lots 5, 6, 11, and 12) allowed a church or school to be built on the lots. However, single-family residences had been built on three of those four lots, and the fourth lot was vacant. Thus, there was no indication that those landowners intended to construct schools or churches on their land.
¶ 31. The Long Meadow Defendants contend that the chancery court’s judgment and the Court of Appeals’ opinion are contrary to this Court’s holdings in PMZ Oil Company v. Lucroy, 449 So.2d 201 (Miss.1984), and White Cypress Lakes Development Corporation v. Hertz, 541 So.2d 1031 (Miss.1989), in which this Court considered the developers’ representations to buyers. I agree. With all due respect to the majority, I fail to see how the facts of those cases are “significantly distinguishable” from the facts in the case at hand.
¶ 32. In PMZ, the developer of Rain-tree subdivision told all of the purchasers and prospective homebuilders that the subdivision would consist of quality, single-family homes. PMZ, 449 So.2d at 202. The developer then attempted to build six townhouses on one lot, and the homeowners sought to have the developer en *582 joined from doing so. Id. The chancery court granted the injunction, and this Court affirmed. Id. Like Phase III of Long Meadow, the Raintree covenants were not recorded with the neighborhood plat. Id. at 203. In fact, the Raintree plat itself was never recorded in the land records. Id. This Court held that filing the plat was not determinative, rather, it was “the use made of the plat in inducing the purchasers, which gives rise to the legally enforceable right in the individual purchasers, and such is not dependent upon ... the filing or recording of the plat.” Id. at 208 (quoting Ute Park Summer Homes Ass’n v. Maxwell Land Grant Co., 77 N.M. 730, 427 P.2d 249, 251 (1967)).
f 33. This Court placed great weight on whether the developer reasonably could have anticipated that representations that the neighborhood would be “an exclusive residential subdivision” and that the covenants would apply to all of the lots would induce buyers to purchase lots in the subdivision. Id. at 207-08. This Court held, “PMZ and its officers should reasonably have anticipated that these representations would induce persons ... first to buy lots and then to build their homes.” Id. at 207. PMZ’s president admitted that he originally had planned for Raintree to be single-family residential only, but he claimed “that he never considered any of his plans to be final.” Id. at 208. The president’s unspoken intent about the finality of his plans for the subdivision did not change the fact that he repeatedly and consistently represented to all purchasers that the subdivision would be single-family, residential only. Id.
¶ 34. Applying the doctrine of equitable estoppel, this Court explained, “if PMZ’s conduct was substantially likely to cause the Lucroys, acting reasonably in their own right, to make the substantial investment of constructing their home on Lot 11 of the Raintree Subdivision, PMZ is es-topped to deny or abrogate the covenants.” Id. at 206. This Court held that, because the developer had represented to the purchasers that the subdivision would include only single-family homes, he could not later permit multifamily dwellings, even though the plat and covenants for the subdivision were not filed in the land records. Id. at 207-08.
¶ 35. In the White Cypress Lakes case, the subdivision consisted of thirteen phases, with a separate plat and restrictive covenants recorded in the land records for each phase. White Cypress Lakes, 541 So.2d at 1032. The ownership changed hands after the first eleven phases had been developed, and the new development company planned to develop the last two phases as a recreational campground. Id. at 1033. Homeowners in the subdivision filed suit to enjoin development of the campground. Id. The chancery court held for the homeowners, and this Court affirmed. Id. at 1034.
¶ 36. The original developer had marketed the neighborhood with promotional literature stating “quality will surround” the homes, and the covenants indicated that only single-family homes would be allowed. Id. at 1033. This Court found no significance in the fact that separate covenants were recorded for each phase or that the covenants were not identical. Id. at 1033. The covenants were “distinctly similar,” and they all included the relevant restrictions that only single-family dwellings could be built and that temporary structures were not allowed. Id. at 1033-34.
¶ 37. This Court considered the representations that the developers had made to the home buyers and found that the developers had “substantially induced purchasers” to believe that the entire subdivision would consist only of quality, single-family *583 homes. Id. at 1085. The new developers were equitably estopped from using any of the land “in a manner inconsistent with the general representations it and its predecessors made in marketing the lots in the other phases of the White Cypress Lakes development.” Id. (emphasis added). The majority of the “representations” at issue were made by the original developers, yet equitable estoppel was enforced against the new developers. Id. It was irrelevant that the nonconforming use was in separate phases, in which none of the homeowners owned land, and this Court held that representations made to purchasers in other phases were binding on all phases. Id.
III. Application of Equitable Estop-pel
¶ 38. The party asserting equitable es-toppel must show “(1) belief and reliance on some representation; (2) a change of position as a result thereof; and (8) detriment or prejudice caused by the change of position.” B.C. Rogers Poultry, 911 So.2d at 492.
A. Belief and Reliance on Representation
¶ 39. In their petition for certiorari, the Long Meadow Defendants cited the testimony of homeowners Alan Cameron and James Propes, who testified that they had relied on assurances from the Leavells and/or their representatives that only single-family, residential homes would be permitted in Long Meadow.
¶ 40. Propes and his wife purchased Lot 23 in Phase II of Long Meadow in 1995. Propes testified that, prior to selecting and purchasing Lot 23, he and his wife toured the subdivision with Dick Marchbanks, the Leavells’ real estate agent. Propes explained to Marchbanks the importance of the neighborhood being entirely residential due to problems he had experienced in other neighborhoods in the past. Propes testified that Marchbanks assured him that all lots in Long Meadow would be residential. Propes said that they looked at multiple lots in Long Meadow, including some in Phase III, and specifically, the lots later purchased by the Harlands. At each lot, Propes asked Marchbanks if the property would be strictly for residential use, and each time Marchbanks assured him that all lots were for residential use only. Propes stated that he had relied on Marchbanks’s representations when he decided to purchase a lot in Long Meadow. Marchbanks also directed Propes to the chancery clerk’s office to look at the protective covenants. Propes located and read the protective covenants, which permitted only single-family, residential use.
¶ 41. Cameron and his wife purchased Lot 46 in Phase II of the subdivision in 2001. Prior to purchasing that lot, the Camerons inquired about protective covenants and learned that covenants were in place that limited development in the subdivision to single-family, residential homes. Cameron testified that if those covenants had not been in place, they would not have purchased in Long Meadow.
¶ 42. Lot 46 backs up to Lots 2, 3, 4, and 8 in Phase III. In 2004, a school attempted to purchase Lots 2, 3, 4, 6, and 8. The homeowners objected to the school’s purchase of the land and advised the school that the property was subject to protective covenants. The school withdrew its interest in the lots. Following that incident, Cameron decided to purchase Lot 8 in Phase III, and he testified that his intent in purchasing Lot 8 was to “clarify the public record and standardize the covenants ... by insuring that it was clear that the residential only protective covenants related to all Long Meadow Subdivision lots, and most particularly *584 phase three since those were the ones that remained to be developed.” Cameron testified that the Leavells agreed that, upon the sale to him, the deed and neighborhood plat would contain the same covenants as Phase II and would prohibit nonresidential use of the lots. The covenants filed with the deed to Lot 8 did, in fact, comply with this agreement. Those covenants were titled “Protective Covenants of Long Meadow Subdivision Phase III” and appeared to apply to all of Phase III. The first paragraph stated that there could be only “one single-family[,] residential structure for each lot described on the plat of Long Meadow Subdivision, Phase III.”
¶ 43. In addition to the Camerons’ deed, two other sets of covenants filed with Phase III lots purported to apply to all of the lots in Phase III. In 2002, the protective covenants filed with David Pryor’s deed for an additional portion of Lot 1 and Joe and Ellen Harris’s deed to Lot 10 were titled “Protective Covenants of Lea-vell Property Bordering Industrial Boulevard.” The property bordering Industrial Boulevard (County Road 1032) is all of Phase III, as that road runs down the middle of Phase III. Those covenants provided that only “one family residential structure” could be placed on any lot in Phase III. Thus, it was reasonable for at least the Camerons, the Harrises, and Pryor to believe that the entire phase was subject to the same restrictions as those set forth in their covenants, because those covenants appeared to apply to all lots in Phase III.[5] These were the first three lots sold in Phase III; thus, anyone else who purchased in Phase III reasonably could have relied upon these covenants as well.
¶ 44. Cameron testified that, during his negotiations with the Leavells regarding Lot 8, he was shown a revised plat for Phase III by Charles Walker and Dick Marchbanks, the Leavells’ attorney and real estate agent, respectively. Those individuals represented to Cameron that anything other than single-family residences would be prohibited in Phase III. It appears that the amended plat and covenants were never filed in the land records, because they could not be found when this litigation ensued. Cameron testified that he would not have purchased Lot 8 if he had thought the residential-only protective covenants would not apply to all of the lots.
¶ 45. Mr. Leavell died in July 2004, one month after the Camerons purchased Lot 8. The remaining Leavells then sold lots in Phase III and filed deeds that did not include the restrictive covenants mentioned in the Camerons’ deed, but instead defined “residential” to include churches and schools.[6] All of the covenants allowing schools and churches were filed after the Camerons, Propeses, and other landowners purchased land based on the Leavells’ representations that only single-family res *585 idences would be permitted in the subdivision.
¶ 46. The chancery court and Court of Appeals found that equitable estoppel did not apply because no covenants were recorded with respect to Phase III and because several individual deeds for Phase III allowed for the construction of a church. Notably, all of the deeds for Phase III lots recorded prior to the Cam-erons’ purchase of Lot 8 permitted only single-family residences. The fact that later deeds allowed churches is of no consequence, because the Camerons could rely only on the Leavells’ representations and the deeds in the land records at the time of their purchase. The Long Meadow Defendants claim that they relied on the representations from the Leavells and their representatives that the entire subdivision would be subject to the same restrictive covenants and that only single-family homes would be permitted.
¶ 47. Ryland Sneed, an engineer who assisted the Leavells with development of Long Meadow, testified that Mrs. Leavell always thought “it would be good to have a church” in the subdivision. However, there is no indication that Mrs. Leavell ever expressed that desire to any of the purchasers. In fact, she went directly against that desire by prohibiting anything other than family, residential structures in all of the restrictive covenants filed from 1988 until 2004. Like the president in PMZ who did not consider his plans to be final, Mrs. Leavell’s subjective intent is of no moment. PMZ, 449 So.2d at 208. See also Wesley M. Breland, Realtor, Inc. v. Amanatidis, 996 So.2d 176 (Miss.Ct.App.2008) (equitable estoppel used to enforce “residential only” covenants against developer who sought to use one lot in a subdivision for commercial purposes; the Court of Appeals affirmed the chancellor, who held that the intent of the investors “should be determined by what they said, and not by what they thought”).
¶ 48. The residents objected when a school attempted to purchase land in the subdivision, and they made it known that they expected only single-family, residential homes to be built in the neighborhood. The Leavells certainly knew this, as evidenced by the option contract with the Harlands, which stated, “The parties will mutually agree to cooperate in obtaining a release of the property from the subdivision restrictions which prohibit the building of a church.” The Leavells knew that the other deeds contained restrictive covenants prohibiting a church because they had signed all of the deeds and covenants. Yet they proceeded to contract with the Harlands, sell the land, and file covenants that directly contradicted what was permitted in the rest of the subdivision. And they did so-in the face of expressed objection by the other landowners.
¶ 49. I respectfully opine that, while the majority asserts that the Harlands relied on oral representations and land records and that they “negotiated for and received a deed that specifically allowed for the construction of a church on the lots purchased,” the majority fails to recognize that all of the Long Meadow Defendants also relied on oral representations and the land records and that they negotiated for and received deeds that specifically prohibited any structures that were not residential. Unlike the Harlands, the Long Meadow Defendants reasonably relied on the Leavells’ representations and had no indication at the time of their purchases that churches might be allowed. The deeds with covenants allowing churches were not filed until 2004, after the other owners had purchased their lots with covenants indicating otherwise. The homeowners relied on representations by the Leavells as well as the written and record *586 ed restrictive covenants, which indicated that the entirety of Long Meadow would be single-family, residential only. There was no evidence to alert them otherwise.
¶ 50. The majority concludes that Propes and Cameron “were on notice” that Phase III of Long Meadow did not have the same covenants as Phases I and II, because the plat for Phase III did not reference covenants like the plats for Phases I and II. When Propes and Cameron purchased their lots in Phase II in 1995 and 2001 respectively, there was no reason for them to look at the plat for Phase III. They had been assured repeatedly that the entirety of the subdivision would be single-family, residential, and they did their due diligence by looking at the land records for the area in which they were purchasing, Phase II.
¶ 51. Purchasers have a duty to examine the proper land records before acquiring property. Hathorn v. Illinois Cent. Gulf R. Co., 374 So.2d 813, 817 (Miss.1979) (quoting Staton, 55 Miss, at 275). Failure to inspect the land records prior to purchase constitutes negligence. Buchanan v. Stinson, 335 So.2d 912, 914 (Miss.1976); Quates v. Griffin, 239 So.2d 803, 808-09 (Miss.1970). However, landowners are required to know of, and have “constructive knowledge” of, only deeds recorded prior to their purchase. Journeay v. Berry, 953 So.2d 1145, 1156 (Miss.Ct.App.2007) (citing Hearn v. Autumn Woods Office Park Property Owners Ass’n, 757 So.2d 155, 158 (Miss.1999)). The laws of this state do not require landowners to examine the deed to every piece of land purchased in their subdivision after their purchase. Rather, the subsequent purchasers should adequately investigate the land records for their property as well as any surrounding properties, if necessary.
¶ 52. As soon as the Long Meadow Defendants became aware that covenants were not filed that covered all of Phase III, they sought to remedy the problem. Cameron testified that he purchased his Phase III lot in 2004 with the intention of clarifying the land records. He was shown a revised plat and covenants for Phase III and he was told that they would be filed in the land records. Although the Phase III covenants shown to Cameron apparently were not filed, Cameron testified that he saw them and that he was assured that they would be filed. Regardless, this Court has held that “equitable estoppel may be used to enforce an oral contract.” Powell v. Campbell, 912 So.2d 978, 981 (Miss.2005) (citing Koval, 576 So.2d at 137; Sanders v. Dantzler, 375 So.2d 774, 776 (Miss.1979)). For equitable estoppel, the “conduct” on which a party relies to his detriment can include actual conduct, actions, language, or silence. McCrary, 757 So.2d at 981 (quoting Chapman v. Chapman, 473 So.2d 467, 470 (Miss.1985)). Further, “[i]t is the use made of the plat in inducing the purchasers, which gives rise to the legally enforceable right in the individual purchasers, and such is not dependent upon ... the filing or recording of the plat.” PMZ, 449 So.2d at 208 (quoting Ute Park, 427 P.2d at 251).
¶ 53. If anyone had “constructive notice” regarding the subdivision covenants, it was the Harlands. The language in the option contract, as well as Mr. Harland’s testimony, indicate that the Harlands actually knew that restrictive covenants prohibited building a church in the subdivision. The Harlands also were aware of the objections of the other landowners. The Long Meadow Defendants voiced their objections by telephone and through multiple letters from the Long Meadow Homeowners’ Association, members thereof, and their attorney. Further, the Har-lands could see that only residential homes had been built in the subdivision. Harland *587 testified that he looked at only one deed from Phase III in the land records, that of Timothy Mays, whose covenants define “residential” to include churches and schools. However, Mays built a single-family residence on his lot, which was visible to Harland. Even if Harland had examined the covenants for all of the lots in Phase III and he had seen that four lots permitted schools and churches, he would have seen that three of those four lots had houses on them. The entire subdivision was made up of only single-family, residential homes.
¶ 54. The Harlands had more than constructive notice; they had actual notice that a church was not permitted in the subdivision. If the Harlands relied on the Leavells’ representations, they did so in light of glaring facts that contradicted the Leavells’ statements. A similar situation was presented in Journeay v. Berry, 953 So.2d 1145 (Miss.Ct.App.2007), and the Court of Appeals held that the parties were bound by restrictive covenants, even though the covenants had been filed improperly, because they had “actual and constructive knowledge of the restrictions” and they “acknowledged the covenants by seeking to obtain variances and other approvals.” Id. at 1149. This is like the Harlands, who acknowledged the restrictions by indicating in the option contract that they would need to obtain “a release of the property from the subdivision restrictions which prohibit the building of a church.”
B. Change of Position and Detriment Caused by Change of Position
¶ 55. As discussed above, both Propes and Cameron testified that they relied on the representations made by the Leavells and their representatives that the entirety of Long Meadow would contain only single-family, residential homes. The representations were confirmed in writing in deeds and restrictive covenants filed for Phase I, Phase II, and half of the lots in Phase III. Cameron and Propes testified that they would not have purchased their lots without these assurances. Cameron and Propes changed their positions from not owning lots in Long Meadow, by purchasing lots and building homes in the subdivision, based on the assurance that the entire subdivision would be single-family, residential only.
¶ 56. The Long Meadow Defendants believe that they will incur detriment as a result of the Leavells’ denial of their previous promises. All of the effects of building a church in the subdivision are unknown, but the Long Meadow Defendants have valid concerns about traffic, safety, noise, and drainage issues. Further, the Har-lands’ deed does not define “structures used for church purposes,” which could result in a variety of structures being constructed on the property. Cameron testified that plans for the church indicated that there would be large parking lots, school facilities, outbuildings, and a ball field with the attendant lighting. This is not consistent with the residential character of the neighborhood. The Long Meadow Defendants wanted to live in a subdivision with only single-family, residential homes. Now they own land and houses in a neighborhood that is not equivalent to that for which they bargained. Because Long Meadow is out of the city limits, it is not subject to zoning. The landowners in Long Meadow rely entirely on the subdivision restrictive covenants to protect the value of their land.
¶ 57. Although numerous Long Meadow homeowners are involved in this suit, it is my position that either Cameron or Propes alone could enforce equitable estoppel, regardless of whether anyone else in the neighborhood joined or even cared. See White Cypress Lakes, 541 So.2d at 1035- *588 36. This Court said the following in White Cypress Lakes:
It may be that only a handful of White Cypress Lakes’ many homeowners object to the RV campground. No matter. The truculence of a single landowner, with or without justification, can prevail over those who propose to use realty in a prohibited manner.
Here, in the case at hand, no process of balancing the equities can make the plaintiffs the greater when compared with the defendant’s, or even place the two in equipoise. The defendant, the owner has done nothing but insist upon adherence to a covenant which is now as valid and binding as at the hour of its making. His neighbors are willing to modify the restriction and forego a portion of their rights. He refuses to go with them. Rightly or wrongly he believes that the comfort of his dwelling will be imperiled by the change, and so he chooses to abide by the covenant as framed. The choice is for him only.... Other owners may consent. One owner, the defendant, satisfied with the existing state of things, refuses to disturb it. He will be protected in his refusal by all the power of the law.
Evangelical Lutheran Church of the Ascension of Snyder v. Sahlem, 254 N.Y. 161, 168, 172 N.E. 455, 457 (1930) (per Cardozo, C.J.). The principle holds as well where the homeowners’ right to relief is grounded only in equitable es-toppel.
White Cypress Lakes, 541 So.2d at 1035-36 (emphasis added).
¶ 58. I recognize that the damage that would result from a church being built in the neighborhood is not as significant as the damage that might result from a different type of structure, such as a gas station, bar, or apartment complex. However; in the future, the Harlands’ land could be sold to anyone, and any type of structure or facility could be placed on the land. It is irrelevant that the covenants for those lots allow only a church and “structures used for church purposes,” because I firmly believe that the effect of the majority’s decision is that covenants have no validity.
¶ 59. Substantial injustice will result from the allowance of the fraud by the Leavells, and the detriment will extend far beyond the metes and bounds of Long Meadow subdivision. I fervently believe that today’s majority decision gives developers permission to say anything to potential purchasers to make a sale, and buyers have no assurance, regardless of whether the promises are verbal or in writing, that the developer will uphold his end of the bargain. Restrictive covenants will have little value. For rural landowners like those in Long Meadow, whose land is not subject to zoning, this will be extremely problematic.
¶ 60. The wrongdoer is not allowed to “enjoy the fruits of his fraud.” Windham v. Latco of Miss., Inc., 972 So.2d 608, 611-12 (Miss.2008). The testimony in this case indicates that the Leavells and their representatives repeatedly promised purchasers, verbally and in writing, that the entire subdivision would be single-family, residential only. The Leavells’ real estate agent assured Propes that all lots in the subdivision would be single-family, residential only. The Leavells verbally promised Cameron that the revised covenants for Phase III would be filed and that only residential homes would be permitted in the entirety of the subdivision. The Lea-vells signed numerous deeds and covenants that included the single-family, residential restriction for all of Phase I and Phase II and half of Phase III (including three sets of covenants that purported to *589 apply to the entirety of Phase III). The Leavells later decided to allow schools and churches in the subdivision, contrary to their explicit promises made for more than fifteen years. The Leavells should be bound by their promises and by the documents they signed. They are “required by common honesty to do that which [they] represented [they] would do.” PMZ, 449 So.2d at 208 (quoting Ute Park, 427 P.2d at 251). The single-family residence restriction should be enforced, and the Lea-vells should be estopped from changing the restrictive covenants of Long Meadow subdivision to allow churches, schools, or any other type of construction other than single-family, residential structures.
¶61. The Leavells, as the developers and those who made the representations, are the ones who should be estopped. However, they already sold the lots at issue to the Harlands, in spite of the landowners’ protest prior to completion of the sale. The Leavells’ option contract with the Harlands allowed the purchase to be cancelled if permission could not be obtained to build a church. Permission was not obtained, but they proceeded with the sale anyway. Although the Harlands did not make representations to the other landowners, they are not without fault. The Harlands acted with knowledge that the other landowners believed that the entirety of Long Meadow was single-family, residential. When the Long Meadow Defendants voiced their objection to a church being built in the neighborhood, the Har-lands hurried to complete the purchase. They did not exercise the option in the option contract, even though the option had not expired and in light of the fact that permission had not been.obtained to build a church. The Harlands participated in the Leavells’ fraud, and neither party should be allowed to “enjoy the fruits of his fraud.”
¶ 62. It is proper to apply equitable estoppel to the Harlands, because equitable estoppel has been used to enforce covenants against a party who has “knowledge of the ‘general plan or scheme’ of a subdivision!,]” regardless of whether covenants are recorded. PMZ, 449 So.2d at 208 (citing Jones v. Cook, 271 Ark. 870, 611 S.W.2d 506 (1981); Johnson v. Mt. Baker Park Presbyterian Church, 113 Wash. 458, 194 P. 536 (1920); Hagan v. Sabal Palms, Inc., 186 So.2d 302 (Fla.App.1966)). The Harlands certainly had “knowledge of the general plan or scheme” of Long Meadow from the plain view of the neighborhood, from the notice given by the other homeowners, and from the language in the option contract.
¶ 63. In this case, equitable estoppel is “the most fair and reasonable remedy,” and substantial injustice could be avoided by enforcing the Leavells’ numerous promises to the landowners. See Powell, 912 So.2d at 981 (citing PMZ, 449 So.2d at 206; Sanders, 375 So.2d at 776). This Court has held that “[w]here one of two innocent parties will suffer a loss from the default or fraud of a third party, the party in the best position to protect himself should bear the loss.” Christian Methodist Episcopal Church v. S & S Const. Co., Inc., 615 So.2d 568, 571-72 (Miss.1993) (citing W. Cas. & Sur. Co. v. Honeywell, Inc., 380 So.2d 1385, 1389 (Miss.1980); XYOQUIP, Inc. v. Mims, 413 F.Supp. 962, 967 (N.D.Miss.1976)). Although I do not take the position that the Harlands are innocent, they are in the best position to protect themselves in this case. They could sell the land back to the Leavells, keep it as an investment, build a house on it, or let the Oxford Church of Christ use it as an investment. They are in the best position to protect themselves and would incur the least detriment. The numerous Long Meadow Defendants have built homes on their land, and they are not in a position *590 otherwise to protect themselves. The only protection the Long Meadow Defendants have is enforcement of their covenants.
IV. Enforcing Restrictive Covenants as Equitable Servitudes
¶ 64. Whether created via legislative or judicial enactment, it may be time for Mississippi to allow a cause of action recognized .in other jurisdictions for enforcement of restrictive covenants, which treats restrictive covenants as equitable servi-tudes, often referred to as a reciprocal negative easement or an implied equitable servitude. See Forster v. Hall, 265 Va. 293, 576 S.E.2d 746, 749-50 (2003); Chase v. Burrell, 474 A.2d 180, 181 (Me.1984); Gauthier v. Robinson, 122 N.H. 365, 444 A.2d 564, 566 (1982). These “equitable servitude” doctrines were “developed in order to provide protection for purchasers buying lots in what they reasonably expected was a general development in which all of the lots would be equally burdened and benefitted.” Roper v. Camuso, 376 Md. 240, 829 A.2d 589, 602 (2003).
¶ 65. Although the precise requirements may vary in different jurisdictions, generally, these doctrines are employed when a common landowner subdivides property into multiple lots, develops the property as a whole pursuant to a common plan or scheme, and attaches restrictive covenants reflecting the common plan to a majority of the lots. See Forster, 576 S.E.2d at 749-50; Chase, 474 A.2d at 181; Gauthier, 444 A.2d at 566; Sanborn v. McLean, 233 Mich. 227, 206 N.W. 496, 497 (1925). The party seeking to enforce a restrictive covenant must prove that there is an express or implied covenant applicable to the property at issue. See Buffington v. T.O.E. Enter., 383 S.C. 388, 680 S.E.2d 289, 291 (2009). Obviously, an express covenant would be stated in the deed or in recorded covenants. Wheeler v. Sweezer, 65 S.W.3d 565, 569 (Mo.Ct.App.2002). However, covenants may be “implied” where the developer of residential property has developed and sold land “pursuant to a common plan or scheme of improvement.” Id. See also Forster, 576 S.E.2d at 749-50; Arthur v. Lake Tansi Vill., Inc., 590 S.W.2d 923, 928 (Tenn.1979). To enforce the doctrine, the property at issue must be part of the common plan or scheme, and the purchaser of the property at issue must have actual or constructive notice of the restriction. See Forster, 576 S.E.2d at 749-50; Chase, 474 A.2d at 181; Gauthier, 444 A.2d at 566; Sanborn, 206 N.W. at 497.
¶ 66. Generally, an action to enforce restrictive covenants can be brought by anyone for whose benefit the covenant was made. Anderson v. Bommer, 926 P.2d 959, 962 (Wyo.1996) (power to enforce the covenants is granted to every record property owner); Eakman v. Robb, 237 N.W.2d 423 (N.D.1975) (purchasers brought action to enforce restrictive covenants against owner and developer); Anderson v. New Prop. Owners’ Ass’n of Newport, Inc., 122 S.W.3d 378, 384-85 (Tex.App.2003) (property owners’ association had standing to bring suit); Wheeler, 65 S.W.3d at 569 (“covenants can be enforced by any benefited landowner”); Save the Prairie Soc. v. Greene Dev. Group, Inc., 323 Ill.App.3d 862, 256 Ill.Dec. 643, 752 N.E.2d 523, 528 (2001) (“Owners of all similarly encumbered lots subject to the same general plan have the right to enforce such covenants.”).
¶ 67. “[W]hen a common grantor imposes restrictive covenants on a tract of land as part of a common plan or general scheme of development, an owner of a lot in the tract may enforce the covenants against the owner of any other lot in the tract.” Kohl v. Legoullon, 936 P.2d 514, 516 (Alaska 1997). See also Forster, 576 *591 S.E.2d at 750; Karner v. Roy White Flowers, Inc., 351 N.C. 483, 527 S.E.2d 40, 42-43 (2000); Jubb v. Letterle, 185 W.Va. 239, 406 S.E.2d 465, 468 (1991); Marion Rd. Ass’n v. Harlow, 1 Conn.App. 329, 472 A.2d 785, 788 (1984); Ruffinengo v. Miller, 579 P.2d 342, 343 (Utah 1978). Courts also have held that, where a property owner or developer intended to establish a common plan or scheme in a subdivision, the “fact that some lots in a subdivision are sold without restrictions does not invalidate restrictions placed on the remaining lots.” McIntyre v. Baker, 660 N.E.2d 348, 352 (Ind.Ct.App.1996). “If such a scheme of development is proved, ‘the grantees acquire by implication an equitable right ... to enforce similar restrictions against that part of the tract retained by the grantor or subsequently sold without the restrictions to a purchaser with actual or constructive notice of the restrictions and covenants.’” Forster, 576 S.E.2d at 750 (emphasis in original) (internal citations omitted). See also Kuhn v. Saum, 316 Mo. 805, 291 S.W. 104, 106 (1926); Allen v. City of Detroit, 167 Mich. 464, 133 N.W. 317, 319 (1911); Hagan, 186 So.2d at 307.
¶ 68. But, notwithstanding this brief discussion on the doctrines of equitable servitude, the Long Meadow Defendants are entitled to relief under our well-entrenched doctrine of equitable estoppel.
V. Summary of Argument
¶ 69. It is my opinion that the Long Meadow Defendants have proven the existence of the elements required for equitable estoppel: “(1) belief and reliance on some representation; (2) a change of position as a result thereof; and (3) detriment or prejudice caused by the change of position.” B.C. Rogers Poultry, 911 So.2d at 492. Testimony indicates that the Lea-vells and their representatives made numerous representations to the Camerons, the Propeses, and the other Long Meadow Defendants for more than fifteen years regarding the development of Long Meadow, repeatedly assuring them verbally and in writing that the entirety of the subdivision would be single-family, residential. Propes and Cameron both testified that they had changed their positions in response to these representations, and that they would not have purchased their lots without these assurances. The Long Meadow Defendants now believe that they will incur detriment as a result of the Leavells’ denial of their promises.
¶ 70. In light of the foregoing, I find that the chancery court and the Court of Appeals erred by failing to find that the Long Meadow Defendants relied on representations by the Leavells and/or their representatives when they purchased lots in Long Meadow. In my opinion, this case should be reversed and rendered on that basis. At a minimum, the case should be remanded for the chancery court to consider the representations made to, and relied upon by, the Long Meadow Defendants in the court’s application of equitable estop-pel. Because the majority finds otherwise, I respectfully dissent.

. Regarding the majority's statement that equitable estoppel is to be used as a shield and not a sword, I will point out that the Long Meadow Defendants are not using equitable estoppel as a sword. The Harlands filed suit in this matter, and the Long Meadow Defendants asserted equitable estoppel as a defense, or a shield, against the Harlands’ allegations.

. The majority asserts that, as early as 1988 a deed was issued without the "single-family residence” restriction, and it points to the 1988 deed of David Pryor. Pryor’s first deed restricted use of the lot to "one double or single family residential structure.” Although those covenants allowed for a double-family residence, the use was still strictly residential. Further, when Pryor was deeded the additional portion to Lot 1 in 2002, the covenants restricted use of the lot to "one family residential structure."

. This version of covenants was filed originally with six lots (Lots 5, 6, 7, 9, 11, and 12) between 2004 and 2007. Lots 7 and 9 were resold in September 2006, and the new deeds referenced the Phase II covenants, which permitted one single-family residence for each four acres of land. Therefore, when the Har-lands purchased Lots 2, 3, and 4, only four lots still had covenants that permitted a school or church.