# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CA-01684-SCT

*IN RE: VALIDATION OF LAUDERDALE
COUNTY, MISSISSIPPI GENERAL OBLIGATION
BONDS, SERIES 2013, IN THE PRINCIPAL
AMOUNT OF THREE MILLION TWO HUNDRED
THOUSAND DOLLARS ($3,200,000.00): JAMES
DAVID HARWELL, JOHN FLOWERS AND
WALLY HUDNALL*

*v.*

*LAUDERDALE COUNTY BOARD OF
SUPERVISORS*


| | |
|---|---|
| DATE OF JUDGMENT: | 09/16/2013 |
| TRIAL JUDGE: | HON. LAWRENCE PRIMEAUX |
| TRIAL COURT ATTORNEYS: | STEPHEN PAUL WILSON |
| | TOMMIE SULLIVAN CARDIN |
| | BRIAN PARKER BERRY |
| | RICHARD BARRY |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | STEPHEN PAUL WILSON |
| ATTORNEYS FOR APPELLEE: | BRIAN PARKER BERRY |
| | TOMMIE SULLIVAN CARDIN |
| | J. RICHARD BARRY |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED.  ON CROSS-APPEAL: AFFIRMED - 08/20/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

**PART ONE**

¶1. The Lauderdale County Chancery Court validated bonds to be issued by the Lauderdale County Board of Supervisors. Several objectors appeal, arguing a sufficient number of qualified electors objected such that an election on the bond issue was required. The Board cross-appeals, arguing that the chancellor erred in not requiring the objectors to post a supersedeas bond. Because the chancery court did not err in validating the bond, nor in denying the request for a supersedeas bond, this Court affirms.

## FACTS AND PROCEDURAL HISTORY

¶2. On April 1, 2013, the Lauderdale County Board of Supervisors resolved to issue general obligation bonds for various county projects. According to its statutory duty, it published the resolution in *The Meridian Star* for four consecutive weeks.[1] The resolution fixed the date for issuing the bonds as May 6, 2013. Per the statute, the resolution provided that

> If on or before 9:00 o'clock p.m. [sic] on May 6, 2013, twenty percent (20%) of the qualified electors of the County or fifteen hundred (1,500), whichever is less, shall file a written protest with the clerk of Lauderdale County against the issuance of the County Bond and/or County Bonds pursuant to the Act, then the County Bond and/or County Bonds for such purpose or purposes shall not be issued unless authorized at an election on the question of the issuance of such County Bond and/or County Bonds to be called and held as provided by law. If no protest be filed on or before 9:00 o'clock a.m. on May 6, 2013, against the issuance of the County Bond and/or County Bonds, then the County Bond and/or County Bonds may be issued without an election on the question of issuance thereof at any time within a period of two (2) years after the date specified in Section 2 hereof.

---

[1]The statute requires that the resolution be published "once a week for at least three consecutive weeks in at least one newspaper published in such county. The first publication of such resolution shall be made not less than twenty-one days prior to the date fixed in such resolution for the issuance of the bonds, and the last publication shall be made not more than seven days prior to such date." Miss. Code Ann. § 19-9-11 (Rev. 2012).

*See* Miss. Code Ann. § 19-9-11 (Rev. 2012).

¶3. Prior to the May 6, 2013, Board meeting, a petition containing 1,558 signatures requesting an election on the bonds had been filed. The Board passed a motion to accept the petitions. It then passed a motion

> to take the aforesaid petitions under advisement so that the Board can investigate the sufficiency of the petition, all signatures thereon would be copied and made available to the public in the Chancery Clerk's Office and the County Website for the next to [sic] weeks so the public can examine the petition and determine if in fact the peoples' names on the petition [sic], and if they signed or want their names on the petition. After the two week period, the petition would then be given to the Circuit Clerk to determine the number of registered voters on the petition.

¶4. After May 6, 2013, the Clerk received nineteen affidavits or counterpetitions from signers of the original petition requesting their names be removed from the protest petition. At the May 20, 2013, board meeting, the Board gave the list of petitioners to the Lauderdale County Circuit Clerk. Between May 6 and May 20, 340 additional signatures calling for a bond election were collected. At the May 20, 2013, meeting, a motion to accept the additional 340 signatures failed, as did a motion calling for an election on the bonds.[2]

¶5. At the June 17, 2013, Board meeting, it was determined that the petition filed May 6, 2013, contained 1,338 valid signatures. One-hundred-fifteen signatures were removed as not being those of registered voters, twelve signatures were removed for being illegible, forty-one duplicate signatures were removed, six signatures were removed because the signers

---

[2]The record and the stipulation of facts alternate as to whether there were 320 or 340 additional signatures. Given that it is stipulated that 321 of these signatures were verified by the Lauderdale County Circuit Court, we assume the petition contained 340 signatures. Regardless, the exact number of signatures is not ultimately of import.

3

were registered to vote in other counties, and twelve signatures were removed for being signed by a spouse.[3] Also at that meeting, the Board voted that it would not accept the additional 340 signatures filed on May 20, 2013. The 321 ultimately validated signatures from this petition filed May 20, if added to the valid signatures from the May 6 petition, would have been sufficient to require an election on the bond issue. The Board, however, did not accept these signatures because they were filed after the deadline. Therefore, the Board did not call for an election on the bonds. The bonds were then sold to Raymond James & Associates, Inc.

¶6. On August 9, 2013, the State Bond Attorney opined that "all the necessary legal steps have been taken to make the issuance of said obligations legal, valid and binding" for $3.2 million in bonds. A bond validation hearing was set for August 26, 2013, and notice thereof was published on August 15, 2013. On August 26, 2013, the objectors in the instant case filed an "Objection to Issuance of Bonds and Bill of Exceptions on Vote not to Call Special Election" in the Lauderdale County Chancery Court. The validation hearing was thus continued to September 10, 2013.

¶7. At the hearing, the objectors argued that an election should have been called on the bond issue, and that the Board waived the petition deadline because it did not immediately begin canvassing the signatures. They argued that the Board's purpose in delaying the investigation into the validity of the signatures was to allow signers to remove their names

_____

[3] The math appears to leave fifteen signatures unaccounted for. Because fifteen signatures does not amount to enough to increase the number on the petition to 1,500, this number is not ultimately of import.

4

from the petition, and therefore the Board essentially kept the petition open past the May 6 deadline. The State Bond Attorney testified that he did not believe the signatures filed after the May 6 deadline should be counted toward the total number of signatures, because the statute specifically states that the signatures must be received on or before the date specified in the resolution.

¶8. The chancery court determined that "the final date set in the resolution for submitting petitions is the final date prescribed in the resolution, and no later." The court also found that "[w]hile the actions of the Lauderdale County Board of Supervisors may have prompted some people to remove their names from the petition, both statutory and case law allow for such to be done, and [caselaw] specifically rules out the submission of additional signatures after the deadline." Thus, the chancery court found that the Board was within its power to reject the signatures filed after May 6, 2013, and overruled the objection to the bond validation. The court consequently entered a validation judgment on September 16, 2013.

¶9. On September 26, 2013, the objectors filed a "Motion to Waive Bond or Alternatively to Set Bond." Because the judgment was not monetary, "the Chancery Clerk was unaware of what type of supersedeas bond to approve." The objectors asked the court to waive the requirement of posting a supersedeas bond and stay the judgment, or, in the alternative, to set a minimal amount for the supersedeas bond. The Board responded, requesting that the court require the objectors to post a supersedeas bond. The Board noted that the county had suffered damages due to the delay in closing the bonds, as the lowest bidder had withdrawn its offer.

¶10.    The chancery court held a hearing on the issue on October 2, 2013. The Board argued that the objectors should post a supersedeas bond in the amount of between $35,000 and $87,000. The court opined that Mississippi Rule of Appellate Procedure 8 supersedes a statute with regard to procedures.[4] It also noted that the requirement of the bond would be detrimental to the objectors, and also that, technically, no supersedeas is needed in this case, because a supersedeas was essentially accomplished "merely by virtue of filing the appeal." The court ultimately declined to require the objectors to post a supersedeas bond, ruling that:

> It's undisputed in the argument before the Court today that the mere filing of the appeal, in effect, accomplishes a supersedeas. I do not believe that a supersedeas is necessary and I do not believe that imposing such an onerous bond requirement on these Objectors is reasonable. And therefore, I find that the Request for a Supersedeas Bond should be denied.

¶11.    The objectors then appealed the validation judgment. The Board cross-appealed the denial of a supersedeas bond.

## ANALYSIS

### 1. Petition for an Election on the Bonds

¶12.    A "chancery court's interpretation and application of the law is reviewed under a *de novo* standard." *Keener Props., LLC v. Wilson*, 912 So. 2d 954, 956 (Miss. 2005).

¶13.    Before issuing any bonds, the board of supervisors must adopt a resolution that contains certain details about the bonds and publish said resolution in accordance with the statute. Miss. Code Ann. § 19-9-11 (Rev. 2012). The Board's compliance with these provisions of the statute is not challenged. Moreover, the statute provides that:

---

[4]This determination was not appealed.

> If twenty per cent (20%), or fifteen hundred (1500), whichever is less, of the qualified electors of the county, supervisors district, or road district, as the case may be, shall file a written protest against the issuance of such bonds on or before the date specified in such resolution, then an election on the question of the issuance of such bonds shall be called and held . . . .

Miss. Code Ann. § 19-9-11 (Rev. 2012).

¶14. The objectors argue that the Board waived the date in the resolution in this case. They claim that, by taking the petition under advisement and allegedly posting the list of the purported signers so that people could remove their names, it failed to respect the May 6 deadline. Rather, the Board allowed the petition to change after this date. The objectors also argue that posting names and signatures on the internet amounted to voter intimidation in trying to convince people to remove their names. The Board argues that caselaw forecloses the issue, and that protest petitions received after the deadline need not be credited.

¶15. This Court addressed a similar situation in *In the Matter of the Validation of $30,000 Road and Bridge Bonds of 1960, Supervisors District No. 3, Neshoba County, Mississippi*, 133 So. 2d 267 (Miss. 1961). The Neshoba County Board of Supervisors passed resolutions to issue bonds. *Id.* at 269. It set the date for qualified electors to request an election as on or before November 10, 1960. *Id.* On November 10, petitions were filed objecting to the issuance of the bonds. *Id.* At the time, twenty percent of qualified electors had signed the petitions, although this fact understandably was unknown to the Board, as it had not yet verified the signatures. *Id.* The Board found it necessary to canvass the poll books to determine whether the petitions were proper, and thus continued the matter to its December 5, 1960, meeting. *Id.* at 269-70. Between November 10 and December 5, several objectors

7

withdrew their names from the petitions, reducing the number of signers to less than twenty percent of the qualified electors. *Id.* at 270. Also between November 10 and December 5, additional petitions with additional qualified electors were filed objecting to the issuance of the bonds. *Id.* If the additional names submitted between November 10 and December 5 were accepted, the total number of qualified electors would be more than twenty percent, requiring an election on the bonds. *Id.* If the additional names were rejected, the total number of objectors would be less than twenty percent of the qualified electors, allowing the Board to forego an election. *Id.* The question was thus whether the Board could remove from the petition the signatures of the qualified electors who removed their names after November 10 and whether the Board was compelled to add to the petition the signatures of the qualified electors who added their names after November 10. *Id.*

¶16. The Court determined that "persons who have filed petitions objecting to a bond issue and asking for an election, have a right to withdraw their names before the matter is finally heard by the board of supervisors." *Id.* at 274; *see also* ***Coleman v. Thompson***, 63 So. 2d 533 (Miss. 1953) ("Persons who have signed a petition, which has been filed with the board, have the right to take their names off at any time before final action by the board.") ("The number of signers and their qualifications are determined as of the date of the board's adjudication, and not as of the date of the filing of the petition."). "[P]arties may always dismiss their lawsuit, their claim, or their objections to a matter submitted to them as citizens and taxpayers." ***Neshoba County***, 133 So. 2d at 274.

8

¶17. The Court, however, determined that names could not be added to the list after the date set in the resolution. It noted that the petitioners argued that "what is good for the goose is good for the gander," and that if names may be withdrawn, they also may be added. *Id.* The Court rejected that argument, holding that:

> The Board of Supervisors gave notice required by law to qualified electors living in the district to determine whether or not persons who will be charged with the taxes desire to oppose the issuance of bonds for the benefit set out in the resolution, and when that date has passed, the matter is closed, and no new petitions may be filed, otherwise the matter would be difficult to conclude. . . . [Parties] could not change their position, once having withdrawn or dismissed their claim, so as to file new petitions after the date set by the board of supervisors in the required resolution giving notice to those who desire to object; nor can qualified electors ignore the notice until after the date when objections are permitted to be filed, and then present their names upon a petition. . . .
>
> [T]he date set out by the Board of Supervisors in its resolution . . . , in which the qualified electors are given notice to file their objections to the issuance of bonds, on or by a certain date, is the final date on which objections may be filed to the issuance of bonds under this section.

*Id.* Accordingly, the final date in the resolution, of which qualified electors have ample notice, is the final date for adding signatures to the petition.

¶18. Therefore, the question here is whether the Board of Supervisors waived the May 6 deadline by publishing the names of the petition signers on the internet and allowing signers to remove their names if they so chose.

¶19. "[I]t is well-settled that it is the duty of a board of supervisors to canvass the names on petitions filed with it in order to determine whether or not such petitions contain the required number with the requisite qualifications, and, that in doing so, the board acts judicially." *Coleman*, 63 So. 2d at 535. And although Section 19-9-11 does not prescribe a

9

method a board must use to verify such signatures, the board must find the necessary facts to determine whether the required number of qualified electors has petitioned for an election. *Id.*; Miss. Code Ann. § 19-9-11 (Rev. 2012).

¶20.   The Board need not begin the investigation immediately. *Neshoba County*, 133 So. 2d at 274 ("the board of supervisors has the right to continue a matter to another meeting to give the board time to determine whether or not the petitions are sufficient to require the board to call an election"). Indeed, "A board, careful of its duty and responsibility and considerate as well of the interests of those affected, may be required by practical considerations to delay its decision in order to afford an opportunity to itself and others to examine and verify the petitions and to check their sufficiency." *Coleman*, 63 So. 2d at 535 (quoting *Costas v. Board of Supervisors*, 196 Miss. 104, 15 So. 2d 365, 367, 16 So. 2d 378 (Miss. 1943)). Moreover, this Court has held  that an objector has a right to remove his signature from a petition before the matter is heard by the board of supervisors. *Neshoba Cnty.*, 133 So. 2d at 274.

¶21.   Consequently, we find the statute and caselaw support the Lauderdale County Board of Supervisors posting the petition to a public forum to ensure those whose names appeared on the petition did in fact want their names on the petition, and to allow individuals to remove their signatures if they so desired. *See* Miss. Code Ann. § 19-9-11; *Coleman*, 63 So. 2d at 535; *Neshoba Cnty.*, 133 So. 2d at 274. Absent evidence of impropriety or an unreasonable delay, such action is a valid exercise of due diligence. *See Coleman*, 63 So. 2d at 535; *Neshoba Cnty.*, 133 So. 2d at 274. Here, there is no evidence that the Board of

10

Supervisors published the names for an improper purpose or to actively persuade signers to remove their signatures. At most, the petition was published for two weeks to afford signers an opportunity to remove their names if they so chose.[5] As a result, the Board of Supervisors acted appropriately and reasonably under the law.

¶22.    Further, the qualified electors in the county had ample notice of the deadline and failed to garner enough signatures by that date. The Board's actions did not waive the statutory deadline.

¶23.    Accordingly, we affirm the judgment of the Lauderdale County Chancery Court on this issue.

**KING, JUSTICE, FOR THE COURT:**

**PART TWO**

¶24.    In its cross-appeal, the Board argues that the chancery court abused its discretion by denying its request for a supersedeas bond.[6]  It argues first that a supersedeas bond is appropriate even though no monetary judgment exists, then argues that the objectors received a "practical stay" simply by virtue of appealing the judgment,[7] and third, argues that public policy requires that a supersedeas bond be posted in bond validation cases because of the potential of objectors to manipulate the system by virtue of the "practical stay" they receive

---

[5] Nineteen people removed their signatures between May 6 and May 20.

[6] The chancellor did order that a cost bond be posted.

[7] It is undisputed that the objectors did not need to obtain a "technical" stay, because the board is unable to close on bonds until no litigation is pending on the bonds; thus, the objectors received a "practical" stay by appealing the bond validation.

11

upon appealing. The objectors argue that no legitimate basis for any particular amount existed, that the status quo is maintained without a supersedeas bond, and that requiring a supersedeas bond in bond validation proceedings as a matter of public policy would violate the United States and Mississippi constitutions.

¶25. A supersedeas bond is "[a]n appellant's bond to stay execution on a judgment during the pendency of the appeal." *Supersedeas bond*, Black's Law Dictionary (10th ed. 2014). Mississippi law provides that "[a] supersedeas shall not be granted in any case pending before the Supreme Court, unless the party applying for it shall give bond as required by the Rules of the Supreme Court." Miss. Code Ann. § 11-51-31 (Rev. 2012). The Court's rules provide that, for a money judgment, an appellant shall be entitled to a stay pending appeal if the appellant posts a supersedeas bond in the amount of 125 percent of the money judgment. M.R.A.P. 8(a). However, in a case without a monetary judgment, the rule provides that "[a]pplication for a stay of the judgment or the order of a trial court pending appeal or for approval or disapproval of a contested supersedeas bond or for an order suspending, modifying, restoring, or granting an injunction during the pendency of an appeal must ordinarily be made in the first instance in the trial court." M.R.A.P. 8(b)(1). "The court shall require the giving of security by the appellant in such form and in such sum as the court deems proper, and for good cause shown may set a supersedeas bond in an amount less than the 125 percent required in cases under Rule 8(a)." M.R.A.P. 8(b)(1). "[T]he purpose of a supersedeas bond is to 'preserve the status quo while protecting the judgment creditor's

12

rights pending appeal,'" and the trial court should attempt to protect the prevailing party. ***Journeay v. Berry***, 953 So. 2d 1145, 1161 (Miss. 2007).

¶26. First, a supersedeas, or stay of execution of the judgment, was not granted in this case.[8] Thus, from a technical standpoint, a supersedeas bond is not necessary.[9] However, the chancellor and all parties do acknowledge that a supersedeas was "effectively" accomplished merely by filing the appeal.[10]

¶27. Because no monetary judgment exists in this case, Rule 8(b) applies, allowing the chancery court to set a sum that it deems proper. A supersedeas bond may be appropriate in cases in which the "relief appealed is nonmonetary." ***Journeay***, 953 So. 2d at 1162. To make matters difficult, the objectors are not appealing any "relief" awarded to the Board against them. Additionally, the Board wants a supersedeas bond to cover "damages and costs," many of which appear to be unrecoverable from the objectors, as they appear to reach

---

[8]There is also no "judgment creditor" to protect.

[9] Moreover, the final result was not a judgment or injunction *against* any party, but rather a simple validation of the bonds, which makes this a unique circumstance.

[10]This case, a bond validation case, does not fit neatly into the supersedeas bond rules. Moreover, the bond validation statute provides for a bond, stating that the bond validation judgment may be appealed "provided such appeal be prosecuted and bond filed within twenty (20) days after the chancellor enters his decree." Miss. Code Ann. § 31-13-5 (Rev. 2010). The statute does not speak to how the chancellor determines any such bond, or even to what type of bond it refers, nor does it appear that this Court has interpreted this portion of the statute. However, the trial court treated these requests as for a supersedeas bond and looked to the Rules of Appellate Procedure. Neither party challenges that tact on appeal, nor asks us to interpret the appeals bond portion of the statute. Rather, both parties treat this as a supersedeas bond under Mississippi Rule of Appellate Procedure 8; thus, we will treat it as such on appeal. In future cases, parties may want to further explore the appeals bond portion of Section 31-13-5.

beyond the costs of litigation, although this issue was not thoroughly litigated at the trial court level. *See* M.R.A.P. 36. In the ***Journeay*** case, the judgment of injunction contained a prospective contempt judgment of $50 per day. The chancellor used that number and multiplied it by the number of days an appeal would be reasonably likely to take, and came up with the monetary amount for the supersedeas bond. ***Journeay***, 953 So. 2d at 1161 n.1. Thus, the court had a monetary basis in its judgment on which to base the supersedeas bond amount.

¶28. In this case, nothing in the judgment "awards" anything to anyone, it merely validates the bonds. The chancery court reviewed the evidence of costs submitted by the Board, and also took note of the hardship this would cause to the objectors in this case. Thus, it appears the chancellor did not abuse his discretion in weighing the evidence and arguments before him and declining to require a supersedeas bond. Further, the Board argues that supersedeas bonds should be required in bond validation cases as a matter of public policy, because "a sole qualified objector can object to the issuance of bonds by any governmental entity in this state, however meritless the objection(s), and then proceed to appeal the trial court's validation judgment which halts the entire bond process. This has the practical effect of prohibiting the governmental entity from using the much needed bond funds while . . . incurring *unprotected* damages and costs on appeal as its buyer withdraws from purchasing bonds because of the delay, and the subsequent rebid." The objectors counter that requiring a supersedeas bond as a condition precedent to the appeal of a bond validation would hamper the ability of citizens/taxpayers to petition the government for a redress of grievances, to

14

access the courts, and to be heard on their claimed rights.  These appear to be considerations for the Legislature as to whether it deems it necessary to protect a board and/or taxpayer objectors in a bond validation objection.  To the extent they are not considerations for the Legislature, the concerns of *both* parties are certainly valid.  Abuse of the court system to delay politically unpopular bonds is concerning, as is hampering the taxpayer's right to object to how their funds are used by their representatives.  A chancery court is perfectly capable of weighing these competing concerns and determining whether a supersedeas bond is appropriate based on the facts of a particular case.  The chancery court in this case noted and considered the costs incurred by the Board and the effect that requiring a supersedeas bond would have on the objectors, and declined to order a supersedeas bond, appropriately weighing the considerations.  Thus, it did not abuse its discretion.

¶29.    This Court therefore affirms the chancery court's denial of the request for a supersedeas bond.  The chancery court weighed the appropriate considerations in determining whether to require a supersedeas bond and did not abuse its discretion in declining the request for a supersedeas bond under the facts of this particular case.

¶30.    **ON DIRECT APPEAL: AFFIRMED.  ON CROSS-APPEAL:  AFFIRMED.**

**PART I: DICKINSON, P.J., LAMAR, CHANDLER AND COLEMAN, JJ., CONCUR.   KING, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J., KITCHENS AND PIERCE, JJ.**

**PART II:  WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE AND COLEMAN, JJ., CONCUR.**

**KING, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶31. While I agree with the result reached by the majority in Part One, I believe that the Board acted improperly in delaying its investigation to publish petitioners' names in order to have the petitioners remove their names.

¶32. The key difference between the case at hand and the cases cited by the majority is that, in this case, the Board's resolution takes affirmative action to encourage people to remove their names from the petition. The Board stated that the purpose of posting the petition was for the public to determine "if they signed *or* want their names on the petition." (Emphasis added). The use of the disjunctive "or" signifies that if a person signed and whether he or she wants his or her name on the petition are two different and separate inquiries. Obviously, if someone's signature was forged, it is not valid, and a comparison to the voter rolls would likely reveal such invalidity. Thus, whether someone "wants their name" on the petition is an entirely separate inquiry than whether the signature/name is validly on the petition. The clear meaning is to allow people who validly signed the petition to change their minds and remove their names. Thus, the Board's posting of names and signatures on the internet was for the admitted purpose, at least in part, of allowing people to change their mind and remove their names from the petition, given that the stated purposes of the delay and name posting were to guard against fraudulent signatures, and *to see if people "want their names on the petition."*

¶33. As the majority notes, "it is well-settled that it is the duty of a board of supervisors to canvass the names on petitions filed with it in order to determine whether or not such petitions contain the required number with the requisite qualifications, and, that in doing so,

16

the board acts judicially." *Coleman v. Thompson*, 63 So. 2d 533, 535 (Miss. 1953). Moreover, the Board must find the necessary facts to determine whether the required number of qualified electors had petitioned for an election. *Id.* I acknowledge that the majority is correct that it is clear that the Board need not begin the investigation immediately. *In the Matter of the Validation of $30,000 Road and Bridge Bonds of 1960, Supervisors District No. 3, Neshoba County, Mississippi*, 133 So. 2d 267, 274 (Miss. 1961). "Practical considerations may delay the canvass." *Coleman*, 63 So. 2d at 535. A board's decision may be necessarily delayed to "afford an opportunity to itself and others to examine and *verify the petitions* and *check their sufficiency*. No action therein should be taken until it has determined this fact." *Id.* (internal quotations omitted) (emphases added). Thus, the Board may examine and verify the petitions and check their sufficiency. The statute requires a certain number of qualified electors to sign the petition. Thus, under the statute and caselaw, the Board has every right, indeed, a duty, to determine whether the petition is proper under the statute, namely whether the signatures are those of qualified electors, and whether the proper number of signatures exists. However, nowhere in the statute or caselaw is any indication that persuading signers to remove their names from the petition is a proper purpose of the Board. In other words, whether someone who validly signed the petition continues to want his or her name on the petition is not a proper issue for the Board to investigate under the statute and caselaw, as it does not determine whether the signers are qualified electors nor whether the proper number of signatures exist. Further, such an objective neither "verifies the petition," nor "checks its sufficiency." It appears that the Board's "investigation" in this

17

case, by posting names to the public for the partial purpose of allowing people to change their minds, has no basis in statutory or caselaw. The Board may take what delay and action is necessary to verify the facts of the petition. Individual petitioners may change their minds and remove their names. However, the Board employing an investigatory delay simply to encourage people who validly signed the petition to remove their names has no basis in the statute or caselaw.

¶34. I agree with the majority that the delay by the Board did not waive the deadline. For more than fifty years, the law has been that signatures filed after the deadline are not counted – the objectors cannot claim insufficient notice of this concept. However, the Board, too, is held to its clear statutory deadline; it may not delay, as it did, at least partially in this case, when the delay is *not* for the purpose of engaging in *verification* of the petition. In my opinion, the remedy, however, is not to deem the statutorily mandated deadline waived, but to include any signatures improperly removed in the final count. In this case, nineteen people removed their signatures between May 6 and May 20, during the Board's delay for, at least partially, purposes without statutory basis. I do not believe we need to decide whether or how those signatures should be "added back" to the petition,[11] because, even if they are added back in this case, the objectors still lack the 1,500 signatures needed to call for an election. Thus, I agree with the Court's decision to affirm the chancery court on this issue, but I maintain that boards may only "delay" in order to verify petitions and check their

[11]Certainly, if added back, concerns of whether the signers would have removed their signatures even absent the Board's actions would arise.

18

sufficiency, as laid out in the statute and caselaw, and not for other purposes without a statutory basis.

**RANDOLPH, P.J., KITCHENS AND PIERCE, JJ., JOIN THIS OPINION**.